1

2

3                  UNITED STATES DISTRICT COURT

4                  EASTERN DISTRICT OF CALIFORNIA

5

| | |
|---|---|
| JOHN ROE, a minor, by and through his Guardian ad Litem, SHEILA IRENE CALLAHAN,<br><br>                    Plaintiff,<br><br>     v.<br><br>GUSTINE UNIFIED SCHOOL DISTRICT; GOLDEN VALLEY UNIFIED SCHOOL DISTRICT; KYLE MATTHEW FISCHER, aka KYLE SIMMONS, a minor; KELLY SIMMONS; JASON SIMMONS; MATTHEW McKIMMIE, a minor; MYRNA TYNDAL; TOMMY SAN FELIPO, a minor; FRANK HUDSON; BETTY HUDSON; CARL SCUDDER; JASON SPAULDING; ANTHONY SOUZA; ADAM CANO; TIMOTHY HAYES; KULJEEP MANN; CHRIS IMPERATRICE; and DOES 1-200,<br><br>                    Defendants. | 1:07-CV-00796-OWW-SMS<br><br>MEMORANDUM DECISION RE DEFENDANTS GUSTINE UNIFIED SCHOOL DISTRICT, JASON SPAULDING, ANTHONY SOUZA, AND ADAM CANO'S MOTION FOR SUMMARY JUDGMENT (Doc. 96) AND DEFENDANT CARL SCUDDER'S MOTION FOR SUMMARY JUDGMENT (Doc. 91.) |

## I.   INTRODUCTION

     This case arises from alleged student-on-student harassment of Plaintiff John Roe while he was attending a football camp at Liberty High School in July 2006.  In July 2006, Plaintiff was an incoming freshman at Gustine High School, who intended to play football for Gustine High in the fall of 2006.  Plaintiff attended a football camp jointly coordinated by Gustine and Liberty High Schools.  While at football camp, Plaintiff was assaulted by

1

several upper class teammates, and suffered additional acts of hazing by these individuals.

The defendants are the Gustine and Golden Valley Unified School Districts, Gustine High School football coaches, the individuals who allegedly perpetrated these events, and the parents of the minors allegedly involved in these events.

On May 31, 2007, Sheila Irene Callahan, as guardian ad litem for John Roe,[1] a minor, the real party in interest, filed this action against defendants under 20 U.S.C. section 1681-1688 ("Title IX") and 42 U.S.C. § 1983, as well as various state law tort claims. Plaintiff contends that the school districts and their employees violated Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681 *et seq.*, by being deliberately indifferent to the alleged harassment. Plaintiffs' claim for relief under 42 U.S.C. § 1983 is based on an alleged equal protection violation under U.S. Constitutional Amendment XIV.

Plaintiff's state law claims against the school districts and its employees relate to their negligent failure to supervise the students under their custody and control.

Before the court are motions for summary judgment filed by Defendants Gustine Unified School District, Jason Spaulding, Anthony Souza, and Adam Cano (collectively "School District Defendants") and Defendant Carl Scudder ("Scudder") (all

_____

[1] John Roe is the pseudonym for the Plaintiff, who was fourteen years old during the incidents giving rise to this litigation.

**2**

collectively "Defendants").[2]   **Defendants' motions seek summary judgment as to all of Plaintiff's claims against Gustine Unified School District or School District employees.**

## II.   FACTUAL BACKGROUND

**Because all material facts must be viewed in the light most favorable to the non-movant, they are accepted as true.   The parties' submissions present the following facts:[3]**

## A.   The Parties

**At all relevant times, Plaintiff, John Roe, was a minor, under the age of eighteen years.   (Compl. ¶ 5.) Sheila Callahan is the biological mother of John Roe, and both reside in Glendale, Arizona.   (Compl. ¶ 5.)**

**Gustine Unified School District ("GUSD") was a public school district in the County of Merced.   (Compl. ¶ 6.)   Gustine High School ("GHS") was a subordinate entity under GUSD.   (Id.) Defendants Carl Scudder, Jason Spaulding,, Anthony Souza, and Adam Cano (collectively "Individual GUSD Defendants") are employees of**

---

[2] District Defendants and Scudder filed separate motions for summary judgment.   Due to the overlapping facts and issues presented by these motions, all Defendants' motions are addressed together.

[3] Unless otherwise noted, the facts are undisputed.   Along with his opposition, Plaintiff filed a "Statement of Disputed/Undisputed Facts in Opposition to Defendants Motions for Summary Judgment," ("PSUF").   Defendants Gustine Unified School District, Jason Spaulding, Anthony Souza, and Adam Cano filed a "Statement of Undisputed Facts in Support of Motion for Summary Judgment," ("DSUF"), on April 30, 2009, as did Defendant Carl Scudder, ("Scudder SUF").

3

a GUSD and/or Gustine High School. (Compl. ¶ 7.)

Golden Valley Unified School District ("GVUSD") was a public school district in the County of Madera. (Compl. ¶ 8.) Liberty High School ("LHS") was a subordinate entity under GVUSD. (Id.) Defendants Hayes, Mann, and Imperatrice (collectively "Individual GVUSD Defendants") are employees of a GVUSD and/or Liberty High School. (Compl. ¶ 9.)

Defendants Kyle Simmons and Michael Simmons were minors residing in the County of Merced. (Compl. ¶ 10.) Defendants Kelly Simmons and Jason Simmons are the biological parents of Kyle Simmons and Michael Simmons. (Id.)

Defendant Matthew McKimmie is a minor residing in the County of Merced. (Compl. ¶ 11.) Defendant Myrna Tyndal is the biological mother of Matthew McKimmie. (Id.)

Defendant Tommy San Felipo is a minor residing in the County of Merced. (Compl. ¶ 12.) Defendants Frank Hudson and Betty Hudson are the legal guardians of Tommy San Felipo. (Id.)

In July 2006, Kyle Simmons, Michael Simmons, Matthew McKimmie, and Tommy San Felipo were upperclassmen on the Gustine High School football team. It is undisputed that Kyle Simmons and Michael Simmons were reprimanded by GHS administrators for behavioral issues prior to the July 2006 football camp, including having their interdistrict transfers suspended or revoked. (Scudder Dep. 117:3-117:25.) Coach Scudder was aware of the suspension prior to the July 2006 football camp. (Id.)

B.   The July 2006 Football Camp

On July 13th through July 15th, 2006, Gustine High School and

**4**

Liberty High School held a contact football camp at Liberty High School.   (PSUF 20.)   The camp was organized and planned by Defendants Chris Imperatrice, head football coach at LHS, and Carl Scudder, head football coach at GHS.   (PSUF 35.)   GHS and LHS football players and coaches participated in a similar camp in the summers of 2004 and 2005.   (PSUF 36.)   There were no reported incidents of hazing or sexual harassment in 2004 or 2005.

Approximately 60 GHS players attended the 2006 football camp, which was a designated "Play Day" event under California Interscholastic Federation ("CIF") rules.[4]   (PSUF 39-40.) Attendance at the football camp was voluntary and players did not receive school credit for their attendance.[5]  (DSUF 4-5; Scudder SUF 3-4.)   GHS students were transported to and from the Camp by two buses that were owned and operated by GUSD. (PSUF 51, 63.)   Use of the buses and participation in the camp was requested in advance by Scudder and approved by Dennis Shaw, the Principal of GHS. (PSUF 52.)

The only requirements for students to be eligible to participate in the camp were 1) that the students (or their parents) sign a Liability Waiver for LHS, 2) that they pay $25 or

_____

[4] According to Coach Scudder, the Camp was intended to be "an opportunity for an individual to improve his football skills and for a team to improve their cohesion and ability to play together." (Scudder Dep. 69:20-69:23.)

[5] GHS and LHS athletics are governed by the California Interscholastic Federation.  In 2006, a CIF rule classified the off-season to include the time period of July 13-15, 2006, and identified an "out of season," organized recreational activity involving teams from two or more high schools, such as the subject Camp, as a "Play Day" event.  (PSUF 38-39)

1  receive a hardship waiver, and 3) that they attend 40 hours of

2  football practice prior to the camp.  (PSUF 44-45.)   It is

3  undisputed that Plaintiff signed the waiver, paid the fee, and

4  attended the required 40 hours of practice prior to July 13, 2006.[6]

5       The GHS players and coaches slept in the LHS gym Thursday and

6  Friday nights, while the LHS players left campus each night after

7  camp activities.  During the Camp, all coaches for GHS and LHS were

8  responsible for supervising the students while on the field and

9  during combined activities.  (PSUF 40-43.)  The four GHS coaches

10  were responsible for supervising the 60 GHS students while off the

11  field, during break, meal and rest periods, and overnight while in

12  the gym.[7]   (PSUF 41-42.)   No other adults were charged with

13  supervising the GHS students during the camp. (PSUF 42.)

14

15  C.   Hazing Incidents

16

17       1.   The Air Pump Incident

18       On the second day of camp, Plaintiff was assaulted by a group

19  of GHS upperclassmen, Kelly Simmons, Michael Simmons, Matthew

20  McKimmie, and Tommy San Felippo.  The group chased Plaintiff into

21  the LHS locker room, held him down, and then inserted a battery-

22  controlled air pump into his rectum.  (Pl. Dep. 188:11-191:10.)

23  The group then activated the pump, inserting air into Plaintiff's

24

25       [6] At time of camp, it is undisputed that GUSD had policies

26  prohibiting sexual harassment and gender harassment/discrimination.
   (DSUF 8.)

27

28       [7] It is undisputed that Coach Cano left Liberty High School
   and returned home following the first evening practice.

**6**

rectum for a few seconds.  (Id. 194:25-196:3.)  According to
Plaintiff, the attack occurred in the presence of several LHS
students, who did not end the assault.  (Id. 196:4-196:22.)
Plaintiff also witnessed these individuals assault several other
teammates with the air pump during the football camp.  (Id.
179:4:181:11.)

It is undisputed that Kelly Simmons, Michael Simmons, Matthew
McKimmie, and Tommy San Felippo assaulted or attempted to assault
with an air hose approximately fifteen players during the July 2006
football camp.

## 2.  The Shower Incident

On the second day of camp, following the assault, Plaintiff
took a shower in the boys' locker room.  (Id. 204:12-204:22.)
While Plaintiff was in the shower, San Felippo, without any clothes
on, entered the shower area and proceeded towards Plaintiff, who
was in the corner of the shower area.  San Felippo grabbed
Plaintiff's shoulders from behind and Plaintiff pushed him away.
(Id. 206:3-207:6.)  According to Plaintiff, San Felippo, in an
effeminate tone, called Plaintiff a homosexual and grabbed his
buttocks.  (Id. 207:13-209:12.)  San Felippo then left the shower
area.  (Id.)

## 3.  The Pillow Fight

On the second night of camp, the players engaged in a pillow
fight.  Based on the record, the pillow fight was a yearly ritual,
with no prior incidents of abuse or violence.  Coach Scudder
approved of the pillow fight and several of the coaches were

7

1    present in the gym for the pillow fight.

2        According to Plaintiff, the pillow cases were filled with baby

3    powder, football equipment, and other heavy objects.   (PSUF 73.)

4    The players then used the filled pillow cases to attack their

5    teammates.   (Id.)   Plaintiff states that he sat next to one of the

6    GHS coaches during the pillow fight in the hopes that he would be

7    protected.   (PSUF 72.) Sensing that he would be attacked anyway,

8    Plaintiff engaged in the pillow fight.   (Id.)   According to

9    Plaintiff, he was then hit in the head and face with the pillow

10   cases stuffed with heavy objects. (PSUF 73.)  Plaintiff states that

11   he suffered injuries as a result of the blows.   (PSUF 71-75.)

12       According to Scudder, the players were not required to

13   participate in the pillow fight.   (Scudder Dep. 172:8-172:14.)

14   Scudder stated that several players sat near their bunks, opting

15   not to participate in the pillow fight.  (Id.)  Neither Scudder nor

16   the assistant coaches witnessed any players put anything into their

17   pillow cases.

18       The assistant coaches also did not report any injuries

19   stemming from the pillow fight, other than Nathan Xavier, who had

20   a bloody nose. (Scudder Dep. 174:9-174:19.) According to Scudder,

21   Mr. Xavier had a bloody nose earlier in the day.   (Id.)

22

23       **4.   Flashing Incidents**

24       According to Plaintiff, during practice at GHS and during the

25   2006 Camp, the Simmons twins and San Felippo repeatedly exposed

26   their genitals to other GHS players both on and off the field.

27   (PSUF 76-78.)  Plaintiff states that San Felippo repeatedly exposed

28   his genitals, and would "slap" players on the head and face with

                                 **8**

his penis.  (Id.)  According to Plaintiff, he was one of the many victims of this conduct. (Id.)

It is undisputed that Plaintiff did not report this behavior to Coach Scudder or any of the assistant football coaches.

There is no evidence that Coach Scudder or any other Gustine high coach witnessed or otherwise knew of any of any players exposing their genitals.

### 5.   Verbal Harassment at Camp

According to Plaintiff, he suffered from repeated sexual harassment by the upperclassmen after the air pump incident. Plaintiff states that he was called homosexual epithets, "resulting in a collective belief among the other GHS players that Plaintiff was a homosexual."  (PSUF 80.)

It is undisputed that Plaintiff did not report this behavior to Coach Scudder or any of the assistant football coaches.

There is no evidence that Coach Scudder or any other Gustine employees witnessed or otherwise knew that any players used homosexual epithets.

## D.   Knowledge of Hazing Events

During the Camp, Coach Scudder observed a group of upperclassmen run across the gym in the direction of a teammate, Kevin St. Jean, who was sitting on his air mattress.  (Scudder Dep. 152:6-152:16.)  According to Scudder, the group, Kyle and Michael Simmons, San Felippo, McKimmie, and Felix Figueroa, pinned St. Jean's arms to his side and blew air up the leg of his shorts, near his thigh.  (Id.)  St. Jean was sitting upright on his air mattress

9

during the incident, never in a spread eagle position.   (Scudder Dep. 153:8-153:12.)   Scudder yelled at the group to stop, verbally reprimanding them and their "horseplay."  (Id.)  Coach Scudder then confiscated the air pump and kept it for the duration of the camp. (Scudder Dep. 153:16-153:18.)

Coach Souza was also present in the gym during the football camp, supervising the players.   There is no evidence that Souza witnessed or otherwise knew of any of the events described above.

Unless specifically noted, there is no evidence that Coach Scudder or any other Gustine high coach witnessed or otherwise knew of any of the events described above.

**E.   Conduct after Camp**

The Camp concluded on Saturday, July 15,2006.  (PSUF 20.)  The GHS coaches and players next met for practice on Tuesday, July 18, 2006.   Plaintiff returned to football practice on July 18, 2006. (DSUF 12.)  Coach Scudder was out of town the week after the Camp so Coach Cano ran the practice in his absence.  During one of the practices, Coach Cano overhead one of the players talking about what was done to Plaintiff during the Camp.  The next day, Coach Cano called Dennis Shaw, the Principal of GHS, and told him he needed to speak with him about behavior at the Camp.   A few days later, the two spoke and set up a meeting to review the incidents.

On Monday, July 24, 2006, Dennis Shaw contacted the Gustine Police Department and Coach Scudder.   Principal Shaw, Coach Scudder, Coach Cano, and an officer with the Gustine Police Department met on July 25, 2006 to discuss the events of July 13 through July 15, 2006.

On September 12, 2006, GUSD initiated expulsion proceedings against the Simmons twins, McKimmie, and San Felippo.

### III. PROCEDURAL BACKGROUND

On May 30, 2007, Plaintiff filed a complaint against Gustine and Golden Valley Unified School Districts, Gustine High School football coaches, the individuals who allegedly perpetrated these events, and the parents of the minors allegedly involved in these events.  (Doc. 1.)  The complaint set forth fifteen causes of action:  (1) violation of statutory rights under Title IX, 20 U.S.C. §§ 1681-1688 against the School District Defendants and their employees; (2) violation of civil rights under 42 U.S.C. § 1983 against the School District Defendants and their employees; (3) sexual battery against the individual Defendants; (4) assault and battery against the individual Defendants; (5) intentional infliction of emotional distress against all defendants; (6) violation of Cal. Constitution, art. 1, § 7(a) against the School District Defendants and their employees; (7) violation of Cal. Civil Code § 52.4 against all defendants; (8) violation of Cal. Civil Code § 51 against the School District Defendants and their employees; (9) violation of Cal. Civil Code § 51.7 against the School District Defendants and their employees; (10) sex discrimination under the Cal. Education Code against the School District Defendants and their employees; (11) vicarious liability of Parent/Guardian for willful acts of a minor; (12) negligent

11

supervision;[8] (13) negligence per se against School District Defendants and their employees; and (14) negligent training against School District Defendants.

Defendants filed their answers to Plaintiff's complaint on August 8, 2007.  (Docs. 33, 35.)

Defendants filed their motions for summary judgment on April 30, 2009.  (Docs. 91, 96.)  Defendants seek judgment on the following grounds:  1) Defendants are immune from Plaintiff's federal and state causes of action pursuant to California Education Code § 35330; 2) Plaintiff's section 1983 claims are barred by the Eleventh Amendment; 3) Plaintiff's evidence is insufficient to create a genuine issue of material fact under Title IX; and 4) Plaintiff's gender violence cause of action lacks merit.

Plaintiff filed his opposition to Defendants' summary judgment motions on July 27, 2009.  (Doc. 107.)  In support of his opposition, Plaintiff submitted a single Memorandum opposing all the motions ("Memorandum").

 Plaintiff argues that Defendants are not immune under any provision of the California Education Code because the football camp was not a "field trip" or "excursion" under Cal. Ed. Code § 35330.  Plaintiff also asserts that a state law immunity is incapable of providing a basis to defeat Plaintiff's federal causes of action.

As to Defendants' arguments concerning liability under federal

---

[8] The complaint includes two negligent supervision causes of action: the first against the School Districts and their employees (Count XIII), the second against the parents/guardians of the minor defendants (Count XIV).

law, Plaintiff argues that the Eleventh Amendment does not bar §
1983 claims against Scudder, Cano, Spaulding, and Souza in their
individual capacities.   Plaintiff also argues that there are
triable issues of material fact as to his Title IX claim against
GUSD.

     In his opposition, Plaintiff conceded he cannot prevail on the
following state law claims against the moving Defendants: (1)
Plaintiff's seventh and ninth causes of action based on Gender
Violence.[9]  (Doc. 107, 7:17-7:19.)

     Plaintiff also concedes the following federal claims: (1)
Plaintiff's Title IX claim for sexual discrimination and harassment
against the individual moving Defendants; and (2) Plaintiff's §
1983 claim against GUSD and the individual moving defendants, in
their official capacity only.  (Doc. 107, 7:23-7:26.)


                         IV.  LEGAL STANDARD

A.   Summary Judgment/Adjudication

     Summary judgment, or summary adjudication, is appropriate when
"the pleadings, the discovery and disclosure materials on file, and
any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(c).  The movant "always bears
the initial responsibility of informing the district court of the
basis for its motion, and identifying those portions of the
pleadings, depositions, answers to interrogatories, and admissions

_____

     [9] Accordingly, summary adjudication is GRANTED in favor of
Defendants as to Plaintiff's seventh and ninth causes of action for
gender violence.

                               13

on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless*, Inc., 509 F.3d 978, 984 (9th Cir.2007). With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Soremekun*, 509 F.3d at 984. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). "[A] non-movant must show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in his favor." *Id*. (emphasis in original). "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining

14

whether a genuine dispute exists, a district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id*. at 255.


# V. <u>DISCUSSION</u>

To determine the scope of the federal actions that may be considered as part of the Plaintiff's case, the first inquiry addresses Defendants' arguments that they are immune from liability for Plaintiff's federal claims under Cal. Educ. Code § 35330.


## A.    <u>Immunity Under California Education Code § 35330</u>

Defendants argue that Cal. Educ. Code § 35330, subsection d, disposes of Plaintiff's entire action.    Specifically, Defendants contend that Plaintiff's claims, both federal and state, are barred by Cal. Educ. Code § 35330(d), which provides immunity to school districts, charter schools and the State of California for injuries occurring during a "field trip" or "excursion."    Section 35330(d) provides:

> All persons making the field trip or excursion shall be deemed to have waived all claims against the district, a charter school, or the State of California for injury, accident, illness, or death occurring during or by reason of the field trip or excursion.

Plaintiff disputes Defendants' broad interpretation of California's field trip immunity.    Plaintiff maintains that § 35330(d) is "limited to claims for injury, accident, illness, or death occurring during or by reason of the field trip or excursion ... [b]oth Title IX and 1983 suits are civil rights actions - not

personal injury actions."   (Doc. 107, 18:13-18:15.)   Plaintiff argues that even if the field trip immunity applies, "the field trip immunity would affect only state law causes of action and not any federal or constitutional claims."   (Doc. 107, 18:10-18:11.)

The motion presents a question of law largely unrelated to the facts of this case:   does Cal. Educ. Code § 35330(d), a state immunity statute, immunize Defendants from Plaintiff's federal civil rights claims?

Pursuant to 42 U.S.C. § 1988, if a civil rights statute is "deficient in the provisions necessary to furnish suitable remedies," the court is to look to state law.   42 U.S.C. § 1988. This rule is "subject to the important proviso that state law may not be applied when it is inconsistent with the Constitution and laws of the United States." *Robertson v. Wegmann*, 436 U.S. 584, 590 (1978) (internal quotations omitted).   The Supreme Court has identified the purposes behind the Federal Civil Rights Act: (1) to prevent official illegality, *Robertson*, 436 U.S. at 592, and (2) to "compensate persons for injuries caused by the deprivation of constitutional rights." *Carey v. Piphus*, 435 U.S. 247, 254 (1978).

Defendants argue that § 35330(d) is consistent with federal law and "provides guidance on a unique situation not contemplated by federal legislation."   (Doc. 96, 8:9-8:11.) Defendants assert that "without consideration of § 35330 with respect to Plaintiff's federal claims, the law is not adapted to the object as is required by 42 U.S.C. 1988(a)."   (Id.)   Defendant cites a number of federal decisions for the proposition that "federal courts are expressly authorized to adopt state law to define the scope of federal claims, including 42 U.S.C. 1983."

16

1     Defendants rely on *Provencia v. Vasquez*, No. 1:07-CV-0069-AWI-

2 TAG, 2008 WL 3982063, (E.D. Cal., August 18, 2008), to assert that

3 § 35330(d) is consistent with the Constitution and the Federal

4 Civil Rights Act, permitting adoption of § 35330 to define the

5 scope of the federal claims at issue in this litigation. *Provencia*

6 is distinguishable.  Unlike this case, the issue in *Provencia* was

7 whether a state survival statute barring recovery of a decedent's

8 pain and suffering was contrary to the compensation and deterrence

9 purposes of § 1983.[10]  *Provencia* found:

> The deterrent purpose of Section 1983 is satisfied by
> the fact that Section 377.34 allows the estate to
> recover the punitive damages the decedent would have
> been entitled to recover had he survived.
> Unfortunately, once deceased a decedent cannot in any
> practical way be compensated for his injuries or pain
> and suffering, or be made whole.  However, the
> statutory scheme for survivors in California still
> provides compensatory damages for the remaining
> injured parties, i.e. the survivors. California law
> provides for not only recovery by the representative
> of the estate but also for a wrongful death action by
> the decedent's heirs.  Thus, this court finds that the
> Estate's claims for pain and suffering damages and
> hedonic damages are precluded by Section 377.34.

*Id*. at *12 (citations omitted).

     Defendants reliance on *Provencia* is misplaced.  Because
California's statutory scheme still provided for recovery by the
representative of the estate and for a wrongful death action by the
decedent's heirs, *Provencia* found that § 377.34 was not
inconsistent.  In this case, the application of § 35330(d)

---

[10] The Ninth Circuit has not specifically addressed this issue.
*But cf. Gotbaum v. City of Phoenix*, 617 F.Supp.2d 878, 884 (D.
Ariz. 2008) (stating "[m]ost courts have concluded that state
statutes limiting civil remedies in cases where a constitutional
violation has caused death to the victim simply are not consistent
with the purposes of section 1983.").

completely eliminates any potential remedy for Plaintiff under §
1983 and Title IX.   Barring recovery is inconsistent with Supreme
Court precedent and the legislative intent that protection of
federal civil rights be encouraged. *See Felder v. Casey*, 487 U.S.
131, 139 (1988) ("the central objective of the Reconstruction-Era
civil rights statutes ... is to ensure that individuals whose
federal constitutional or statutory rights are abridged may recover
damages or secure injunctive relief.") (citation omitted).
Defendants' attempt to apply or expand the holding of *Provencia*
fails.

*Good v. Dauphin County Social Services for Children and Youth*,
891 F.2d 1087 (3d Cir. 1989), is analogous.   In *Good*, a mother
suspected of child abuse brought a civil rights action against
municipal and county officials who allegedly conducted an improper
search of her home.   Defendants moved for summary judgment under
Pennsylvania's Child Protective Services Law – 11 Pa. St. Ann. §
2211 – which "specifically granted immunity to those carrying out
its provisions."[11]   The District Court granted summary judgment on
grounds that 11 Pa. St. Ann. § 2211 immunized Defendants for any
violation of Plaintiffs' Fourth Amendment rights.    The Third
Circuit reversed:

> A state immunity statute, although effective against
> a state tort claim, has no force when applied to suits
> under the Civil Rights Acts. The supremacy clause of
> the Constitution prevents a state from immunizing

---

[11] 11 Pa. St. Ann. § 2211: "Any person, hospital, institution,
school, facility or agency participating in good faith in the
making of a report, cooperating with an investigation or testifying
in any proceeding arising out of an instance of suspected child
abuse ... shall have immunity from any liability,*1091  civil or
criminal, that might otherwise result by reason of such actions."

1
2
3
4

> entities or individuals alleged to have violated
> federal law. This result follows whether the suit to
> redress federal rights is brought in state or federal
> court. Were the rule otherwise, a state legislature
> would be able to frustrate the objectives of a federal
> statute.

*Id.* at 1091, citing *Wade v. City of Pittsburgh,* 765 F.2d 405, 407-408 (3d Cir. 1985).

Supreme Court and Ninth Circuit precedent is consistent with *Good*. In *Martinez v. State of California*, 444 U.S. 277 (1980), Defendant Parole Board Officials were dismissed (federal and state claims) by the trial court under a California statute conferring immunity on officials responsible for parole decisions. *Id*. The Supreme Court found that "the California immunity statute does not control this claim even though the federal cause of action is being asserted in state courts:"

> Conduct by persons acting under color of state law
> which is wrongful under 42 U.S.C. § 1983 or § 1985(3)
> cannot be immunized by state law. A construction of
> the federal statute which permitted a state immunity
> defense to have controlling effect would transmute a
> basic guarantee into an illusory promise; and the
> supremacy clause of the Constitution insures that the
> proper construction may be enforced. The immunity
> claim raises a question of federal law."

*Martinez*, 444 U.S. at 284 (citations omitted).

The Supreme Court recently reaffirmed this well-established principle in *Haywood v. Drown*, 129 S. Ct. 2108, 2131 (2009): "permitt[ing] a state immunity defense to have controlling effect over a federal claim violates the Supremacy Clause."

The Ninth Circuit recognizes that "state law cannot provide immunity from suit for federal civil rights violations." *Wallis v. Spencer*, 202 F.3d 1126, 1143-44 (9th Cir. 2000); *Romstad v. Contra*

19

1  *Costa County*, 41 F. App'x 43 (9th Cir. 2002).  In *Romstad*, the

2  Ninth Circuit found that the district court erred by applying

3  California Government Code § 820.2, a state immunity statute, to

4  the Romstads' federal claims: "immunity under § 1983 is governed by

5  federal law; state law cannot provide immunity from suit for

6  federal civil rights violations."  *Id*. at 46.

7       Defendants simply ignore federal law concerning the

8  application of state law immunities to federally created statutory

9  rights.  In his reply brief, Defendant Scudder states "[i]f the

10  court were to limit the reach of Education Code § 35330(d) to the

11  state law claims only, this would fly in the face of the clear

12  intent of the [California] legislature to financially protect

13  school district and their employees."  This turns the law on its

14  head.  Defendants' arguments "fly in the face" of the Supremacy

15  Clause and clearly established Supreme Court and Ninth Circuit law

16  that federal not state law is supreme.

17       Congress sought to provide an effective remedy for federal

18  violations, to do so Supreme Court and Ninth Circuit precedent

19  expressly abrogate conflicting state law immunities in federal

20  civil rights cases.  The application of the California "field trip

21  immunity" statute is inconsistent with purposes of the Civil Rights

22  Act.  Section 35330(d) does not preclude a specific form of damages

23  as did the survival statute in *Provencia*.  In this case, if

24  applied, § 35330(d) completely immunizes defendants from liability

25  resulting from a violation of federal law and defeats the federal

26  civil rights act.

27       Even assuming, *arguendo*, that § 35330(d) is applicable to this

28  case, the California "field trip immunity" cannot immunize

1  Defendants from liability resulting from a violation of superceding
2  federal law, only, if applicable, for state law claims.

3

4  B.   **Section 1983**

5       Plaintiff's Complaint alleges that Defendants' actions are
6  prohibited by 42 U.S.C. § 1983 and the Fourteenth Amendment to the
7  U.S.   Constitution.   The   Complaint   states   that   "Defendants
8  intentional   acts   or   omissions   [...]   caused   a   deprivation   of
9  Plaintiff's right to equal protection because as a male victim of
10 sexual abuse and sexual harassment, discrimination and violence by
11 other males, Plaintiff was intentionally treated differently from
12 female victims of sexual abuse and sexual harassment."   (Compl. ¶
13 56.)

14      "Section   1983   provides   a   federal   forum   to   remedy   many
15 deprivations of civil liberties, but it does not provide a federal
16 forum for litigants who seek a remedy against a State for alleged
17 deprivations of civil liberties.   The Eleventh Amendment bars such
18 suits unless the State has waived its immunity, or unless Congress
19 has   exercised   its   undoubted   power   under   §   5   of   the   Fourteenth
20 Amendment to override that immunity."   *Will v. Mich. Dept. of State*
21 *Police*, 491 U.S. 58, 66 (1989).

22

23      1.   **Gustine Unified School District**

24      In *Belanger v. Madera Unified School Dist.*, 963 F.2d 248, 251
25 (9th Cir. 1992), the Ninth Circuit held that a California school
26 district was a state agency for purposes of the Eleventh Amendment.
27 *Belanger* is premised on a number of significant facts; California
28 school districts have budgets that are controlled and funded by the

21

state government rather than local districts, California law treats public schooling as a statewide or central government function, and California school districts can sue and be sued in their own name. *Id.* at 251-54*; see also Doe v. Petaluma City Sch. Dist.*, 830 F.Supp. 1560, 1577 (N.D. Cal. 1993) ("California School districts are arms of the state for purposes of Eleventh Amendment immunity and are therefore immune from liability under section 1983").

Defendant Gustine Unified School District argues that it is an arm of the state for purposes of Eleventh Amendment immunity, entitling it to summary adjudication.  (Doc. 96-2, 9:18-9:20.) Plaintiff does not oppose Defendant's motion, abandoning the § 1983 cause of action against Defendant Gustine Unified School District. (See Doc. 107, 7:25-7:27 (stating Plaintiff "concede[s] dismissal of the following claims: Plaintiff's 42 U.S.C. 1983 claim against GUSD ....]".)

Summary adjudication is GRANTED in favor of Defendant Gustine Unified School District against Plaintiff as to Plaintiff's § 1983 claim.

**2.   Individual Defendants Sued in their Official Capacities**

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.   It is no different from a suit against the State itself." *Will*, 491 U.S. at 71, 109 S.Ct. 2304.

Individual District Defendants move for summary adjudication as to Plaintiff's § 1983 claim against them in their official capacities. (Doc. 96, 10:7-10:16; Doc. 91, 9:14-9:22.)  Plaintiff does not oppose Individual District Defendants' motions, abandoning

the § 1983 "official capacity" cause of action . (See Doc. 107, 7:25-7:27 (stating Plaintiff "concede[s] dismissal of the following claims: Plaintiff's 42 U.S.C. 1983 claim against [...] Defendants Scudder, Cano, Spaulding, and Souza, in their official capacit[ies].".)

Summary adjudication is GRANTED in favor of moving Defendants as to Plaintiff's § 1983 claims against Defendants Scudder, Cano, Spaulding, and Souza, in their official capacities.


### 3. Individual Defendants Sued in their Personal Capacities

Defendants first argue that the Complaint "does not allege that the Individual Defendants are being sued for violations under Section 1983, in their personal capacity." However, when a § 1983 complaint is ambiguous or unclear as to the capacity in which an official is being sued, as is the case here, it is presumed that he is being sued in his personal capacity. *See, e.g.*, *Romano v. Bible*, 169 F.3d 1182, 1186 (9th Cir. 1999) (noting courts "presume[s] that officials necessarily are sued in their personal capacities where those officials are named in a complaint, even if the complaint does not explicitly mention the capacity in which they are sued"); *Shoshone-Bannock Tribes v. Fish & Game Comm'n*, 42 F.3d 1278, 1284 (9th Cir. 1994) (stating "[w]here state officials are named in a complaint which seeks damages under Section 1983, it is presumed that the officials are being sued in their individual capacities. Any other construction would be illogical where the complaint is silent as to capacity, since a claim for damages against state officials in their official capacities is plainly barred.") (citation omitted).

23

1    While the Complaint does not name the Individuals Defendants
2    in their "individual capacities," the Complaint clearly asserts
3    individual capacity claims by specifically naming each Individual
4    Defendant and requesting actual, compensatory, statutory, and
5    punitive damages based on the coaches' personal involvement.[12]
6    Defendants' first argument is insufficient to summarily adjudicate
7    Plaintiff's § 1983 claim in favor of Individual Defendants.
8    However, Individual Defendants advance an alternative argument for
9    summary adjudication, namely that each coach is "shielded from the
10   liability by the doctrine of qualified immunity." (Doc. 96-2,
11   10:24-10:28.)

12       Suits against government officials in their individual or
13   personal, rather than official capacities, are not barred by the
14   Eleventh Amendment. *Price v. Akaka*, 928 F.2d 824, 828 (9th Cir.
15   1990). However, the doctrine of qualified immunity protects
16   "government officials performing discretionary functions ... from
17   liability for civil damages insofar as their conduct does not
18   violate clearly established statutory or constitutional rights of
19   which a reasonable person would have known." *Harlow v. Fitzgerald*,
20   457 U.S. 800, 818 (1982). The doctrine of qualified immunity

21

22       [12] The Complaint does not specifically identify, in the caption
23   or otherwise, whether the Individual Defendants are sued in their
     "official," "personal," or "individual" capacities. (See Compl. ¶
24   7, 9, 13.) However, the Complaint alleges that Defendants "were
     acting within the course and scope of employment at GUSD and/or
25   Gustine High School," and "had the authority to institute
26   corrective measures, were aware of the harassment, yet repeatedly
     and intentionally failed to take the appropriate or necessary
27   measures to prevent or stop the abuse suffered by Plaintiff." (Id.
     at 13.) The Complaint also requests actual, compensatory,
28   statutory, and punitive damages. (Id. at 131.)

protects "all but the plainly incompetent or those who knowingly violate the law ...." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In analyzing a claim of qualified immunity, there are two inquiries: "First, we inquire whether, taken in the light most favorable to the party asserting the injury, that party has established a violation of a federal right.   Assuming this threshold inquiry is satisfied, we consider whether the School Officials' conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Preschooler II v. Clark County Bd. of Trs.*, 479 F.3d 1175, 1179-80 (9th Cir. 2007) (internal quotations and citations omitted).   While this sequence is "often appropriate, it should no longer be regarded as mandatory." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

Plaintiff alleges a claim for violation of his right to equal protection, contending that the Individual Defendant's actions were driven by gender discrimination.   The Complaint alleges generally that employees of GUSD "have enforced and do enforce policies and procedures to prevent and/or remedy female students and female student athletes from male-on-female sexual abuse and sexual harassment, discrimination, and violence."   (Compl. ¶ 49.)   More particularly, Plaintiff alleges that "Defendants intentionally failed to take appropriate disciplinary or remedial measures to address the ongoing harassment, intimidation, assault, battery, and retaliation because of Plaintiff's gender and the male-on-male nature of the sexual abuse and harassment."   (Id.)

The Fourteenth Amendment provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of

the laws."  Denials by any person acting under color of state law are actionable under § 1983.  In order to establish a § 1983 equal protection violation, Plaintiff must show that the Individual Defendants, acting under color of state law, discriminated against him as a member of an identifiable class and that the discrimination was intentional.  *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F3d 1130, 1134 (9th Cir. 2003).

An equal protection claim turns on proof that the defendant "acted in a discriminatory manner and that the discrimination was intentional."  *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000) (citation omitted).  A "long line of Supreme Court cases make clear that the Equal Protection Clause requires proof of discriminatory intent or motive."  *Navarro v. Block*, 72 F.3d 712, 716 (9th Cir. 1995) (emphasis in original; citations omitted).  To preserve his equal protection claim, Plaintiff needs evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the individual defendants' conduct was motivated by gender discrimination.  *See, e.g., Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948-49 (9th Cir. 2003).

Plaintiff does not specifically address equal protection.  Plaintiff states "the Eleventh Amendment immunity does not bar claims against Scudder, Cano, Spaulding, and Souza in their individual capacities.  In that respect summary judgment should be denied [....]"  (Doc. 107, 25:15-25:19.)  Plaintiff does not identify specific evidence that the Defendants denied protection to GHS male students that it afforded similarly situated female students.  Nor is there evidence that his coaches acted with gender animus.

1    **Plaintiff has the burden to establish his equal protection**
2    **allegations.** *See Reese,* **208 F.3d at 740 ("To succeed on a § 1983**
3    **equal protection claim, the plaintiffs must prove that the**
4    **defendants acted in a discriminatory manner and that the**
5    **discrimination was intentional.") (citation omitted). The record**
6    **is devoid of evidence of gender discrimination other than the**
7    **allegations the Complaint's conclusory allegations that sexual**
8    **harassment policies were applied differently based on gender.**
9    **Pleadings are insufficient to oppose summary adjudication.** *See*
10   *Ross v. Hoeft,* **No. 07-17369, 2009 WL 3748187 *1 (9th Cir. Nov. 10,**
11   **2009) (stating that "[i]n order to rebut a party's motion for**
12   **summary judgment, the non-moving party must point to specific facts**
13   **supported by the record, which demonstrate a genuine issue of**
14   **material fact [...] [s]uch specific facts, however, may not come**
15   **from mere allegations or denials in its own pleading.").**

16   *Reese,* **208 F.3d 736, held that defendant school district,**
17   **which excluded plaintiff students from commencement ceremony for**
18   **throwing water balloons at boys in the boys' restroom, did not**
19   **violate the Equal Protection Clause when it punished female**
20   **plaintiffs without punishing the male students accused by the**
21   **plaintiffs.[13]**

22

23
24      [13] Concerning the circumstances of the water balloon fight and
the school districts' response in *Reese*, the Ninth Circuit
25   recounted: "The plaintiffs admitted hiding in the boys' bathroom,
but argued that they were merely retaliating for several acts of
26   harassment committed by the boys during the school year. Prior to
[the school board hearing re: their dismissal], the plaintiffs had
27   never reported any harassment, and the record offers no evidence
that the school district actually knew prior to May 28 of the boys'
28   alleged harassment of the girls." *Id*. at 738.

27

> The record does not support a charge that the school district acted with an impermissible motive, even if its disciplinary action against the plaintiffs can be viewed as harsh.  There is no direct evidence of gender animus, nor is there even evidence of system-wide disparate impact in punishments between genders.  The plaintiffs concede that the school district has enacted anti-harassment policies and has a record of enforcing those policies when violations are reported in a timely manner.  Rather, the plaintiffs rely almost entirely on the fact that in this one case the girls who were caught "in the act" of inappropriate behavior were punished, while the accused boys, whose behavior had not been previously reported, were not punished.

*Id.* at 740.

Here, the Complaint suggests that the Individual Defendants, and GUSD, responded differently to "male-on-female" complaints of sexual abuse and/or sexual discrimation than it did to "male-on-male" incidents of the same conduct, but Plaintiff presents no evidence to support his claims that males and females were treated differently.   Absent evidence of unconstitutional motive, Plaintiff's § 1983 claim necessarily fails.  Summarily adjudicating Plaintiff's § 1983 in favor of Individual Defendants is consistent with Ninth Circuit precedent.  *See Reese, supra*.[14]

It is undisputed that GUSD had a sexual harassment policy in 2006 and that the policy prohibited sexual harassment and gender harassment/discrimination.  (DSUF 8.)  The record reveals the only

---

[14] *But cf. Flores,* 324 F.3d at 1135, where the Ninth Circuit upheld the district court's denial of summary judgment on Plaintiff's § 1983 equal protection claim because "[t]he plaintiffs presented evidence that they were harassed for years and that the defendants failed to enforce these policies to protect them.  When viewed in the context of the other evidence plaintiffs presented and their interactions with the defendants, there is sufficient evidence for a jury to reasonably find that plaintiffs were treated differently."

permissible inference is that the policy was consistently and fairly applied to male and female students enrolled in the Gustine Unified School District.   The record also demonstrates that once school officials learned of the alleged sexual harassment, they suspended the suspected students and, later, expelled them.   (PSUF 91-92).   Plaintiff does not explain how this treatment differed from similar incidents involving female students, if there were such incidents.   There is no record evidence that Plaintiff's coaches treated him differently and discriminated against him because he was a male.

Viewing the evidence in the light most favorable to Plaintiff, no evidence shows a violation of Plaintiff's equal protection constitutional rights.  Summary adjudication is GRANTED in favor of Defendants Scudder, Cano, Spaulding, and Souza in their individual capacity on Plaintiff's equal protection claim.

### C.   Title IX

Defendants Scudder, Cano, Spaulding, and Souza move for summary judgment, arguing that they cannot be held individually liable under a Title IX theory.  (Doc. 91, 10:18-10:21.)  Plaintiff does not oppose this motion, abandoning the Title IX cause of action against Defendants Scudder, Cano, Spaulding, and Souza. (See Doc. 107, 7:23-7:25, filed July 27, 2009 (stating Plaintiff "concede[s] dismissal of the following claims: Plaintiff's 42 U.S.C. 1983 claim against ... Defendants Scudder, Cano, Spaulding, and Souza, in their official capacity.".)

Summary judgment is GRANTED in favor of Defendants Jason Spaulding, Anthony Souza, Adam Cano, and Carl Scudder as to

Plaintiff's Title IX claim for sexual discrimination and harassment.[15]

Defendant GUSD seeks summary judgment against Plaintiff's second claim for a violation of Title IX. Plaintiff alleges that "the severe and pervasive attacks on Plaintiff during the Camp amount to sexual discrimination and harassment in violation of Title IX." The substance of Plaintiff's Title IX claim is that Coach Scudder, the Gustine High School head football coach and supervisor of the GUSD approved football camp, had actual knowledge of the student-to-student sexual harassment occurring during the football camp and took no disciplinary action.

Title IX provides, with certain exceptions not relevant here, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). Recipients of federal funding, like the Gustine Unified School District, may be liable for damages under Title IX for student-on-student sexual harassment. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999).

For student-to-student sexual harassment, four requirements for imposition of school district liability under Title IX are:

---

[15] Individual defendants cannot be found liable under Title IX: "The Government's enforcement power may only be exercised against the funding recipient, see [20 USC] § 1682, and we have not extended damages liability under Title IX to parties outside the scope of this power." *Davis*, 526 US at 641 (citations omitted); *see also Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999), cert denied, 530 U.S. 1262 (2000) ("only recipients of federal funds may be held liable for damages under Title IX").

> (1) the school district must exercise substantial control over both the harassed and the context in which the known harassment occurs, (2) the plaintiff must suffer sexual harassment . . . that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school, (3) the school district must have actual knowledge of the harassment, and (4) the school district's deliberate indifference subjects its students to harassment.

*Reese,* 208 F.3d at 739.

Defendant GUSD argues that the alleged harassment was not severe and pervasive; not based on Plaintiff's gender; that the District lacked actual knowledge of alleged sexual harassment; and that there is no evidence of deliberate indifference by GUSD.

### 1. Substantial Control

The Supreme Court limited a school district's liability to "circumstances wherein the [district] exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 US at 646; *see also Reese*, 208 F.3d at 739. GUSD argues that the first factor is not met because "the alleged conduct occurred during a voluntary football camp, which was not held on GUSD campus and which occurred during the summer before school was in session." (Doc. 91, 12:5-12:7.)

The first requirement is that the District exercised substantial control over the harasser and the context in which the harassment occurs. This requirement can be met by proof that the misconduct occurred "during school hours and on school grounds" or when the "harasser is under the school's disciplinary authority." *Davis*, 526 U.S. at 646. The District argues that none of the

31

allegedly harassing acts took place on "school grounds," given that the most egregious conduct took place on the campus of Golden Valley High School. It is undisputed, however, that the football camp was sponsored and promoted by Gustine High School, its football coaches and administrators, was a core part of Gustine High's football program, and was under the supervision of Gustine High teachers and/or football coaches. The record clearly reveals that the players were transported to and from Liberty High School by GUSD buses and that Gustine High School football coaches supervised the players during the bus ride. The football camp was governed by a GUSD Administrative Directive, outlining supervision ratios, disciplinary procedures, and control techniques. This evidence is sufficient to satisfy this threshold inquiry on summary judgment.

### 2. <u>Pervasive, Severe & Objectively Offensive Harassment</u>

The second requirement is that the harassment is sufficiently severe, pervasive, and objectively offensive that Plaintiff was denied an educational benefit. *Davis*, 526 U.S. at 633. This is a two-part inquiry.

### A. *Severe and Pervasive Sexual Harassment*

As for the first part of the second element, Plaintiff has presented enough evidence that the discrimination was "severe, pervasive, and objectively offensive." *Id*. "Whether gender-oriented conduct rises to the level of actionable harassment depends on a constellation of surrounding circumstances, expectation, and relationships, including, but not limited to, the

32

ages of the harasser and the victim and the number of individuals involved." *Id*. at 651 (citations omitted).   Courts "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults."  *Id*.  *Davis* explicitly recognizes that schools serve as the testing ground for a variety of behaviors that would be unacceptable elsewhere, and that only sufficiently egregious behavior will subject a funding recipient to liability:

> [A]t least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

*Davis*, 526 U.S. at 651-52.

In this instance, Plaintiff's facts are that his teammates pinned him down and sexually assaulted him with an air hose, that he was hit with a pillow carrying a foreign object, that a teammate exposed his penis during a football practice, that one of the assailants subsequently touched his buttocks while in the shower, and that he was called homosexual epithets.  These incidents, if proved, could amount to severe and pervasive conduct that was objectively offensive under Title IX.

This harassment must amount to sexual harassment prohibited by Title IX.  Title IX by its terms provides a remedy only for discrimination or harassment "on the basis of sex."  20 U.S.C. §

1681(a).  Harassment on the basis of sex can be perpetrated by an individual of the same sex as the victim for Title VII purposes, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998), and the same reasoning applies in the Title IX context.  *See Sherez v. Hawaii Dept. of Educ.,* No. 04-00390-JMS-KSC, 2007 WL 602097 at *7 (D. Haw. Feb. 16, 2007) (stating that "Title VII principles guide the resolution of Title IX sexual harassment and discrimination claims.").  Defendant argues that Plaintiff's Title IX claim fails on the ground that the assault is somehow mitigated because his harassers were of the same sex.  Specifically, Defendant argues that the incidents of hazing related to "age" and "class standing," not gender.  Defendant points to Plaintiff's deposition testimony in an attempt to demonstrate the lack of gender animus:

> Q:   And as far as [the air pump victims], it sounds like some of them were freshman, and some of them were people in older grades, and some were even high school seniors; is that right?
>
> A:   Just to that one senior.
>
> Q:   Any other seniors?
>
> A:   Not that it would matter.
>
> Q:   What about juniors?
>
> A:   I doubt it.
>
> Q:   So most of them were freshman then?
>
> A:   Yeah, not even really sophomores.

(Pl. Dep. 178:7-178:18.)

Although the record demonstrates that the perpetrators grabbed some of their victims from the freshman "sleeping area," and that the pillow fight was "upperclassmen vs. lowerclassmen," this does

not eliminate the factual dispute arising from the sexual nature of the perpetrators' acts.   Facts demonstrating that the victims may have been targeted because of their class standing are capable of more than one inference, i.e., the facts are relevant to show animus based on age *and* gender.   The two are not mutually exclusive.

The use of gender-based or sexually loaded insults such as "fag" or "homo" can certainly be indicative of animus on the basis of gender, but the use of such terms without more is not necessarily sufficient to establish gender discrimination.   The Supreme Court in *Davis* recognized that children are not like adults and often engage in behavior that adults would find inappropriate and offensive, without such behavior necessarily being actionable. 526 U.S. at 652.   Although Title IX was not intended and does not function to protect students from bullying generally, the homophobic language used by the perpetrators appears to be part of a larger constellation of sexually-based conduct, which included assaulting Plaintiff with an air hose, exposing their genitalia, and grabbing his bare buttocks in the shower.   Drawing the inferences in Plaintiff's favor, there remains a factual dispute on the issue of whether "the conduct at issue relate[s] to gender."

At oral argument, GUSD maintained that, under Supreme Court precedent, including *Davis*, one instance of peer-on-peer harassment is insufficient to satisfy Title IX.   First, taking the evidence in Plaintiff's favor, Plaintiff has identified multiple incidents of sexually-charged harassment by his peers at the football camp in July 2006.   Second, several courts have held that a single instance of assault is sufficient to state a Title IX claim.   *See T.Z. v.*

1   *City of N.Y.*, 634 F.Supp.2d 263, 270 (E.D.N.Y. 2009) (outlining the
2   cases in which courts have found a single event to withstand a
3   Title IX challenge.)

4        Drawing all reasonable inferences in Plaintiff's favor,
5   material factual issues exist on the type of sexual harassment
6   prohibited by Title IX.  A reasonable jury could find that the
7   alleged harassment, name-calling, and other incidents of an
8   aggressive nature, were sufficiently severe and pervasive and were
9   based upon sex.

10

11           B.    *Denial or Exclusion from Educational Opportunities*
12       The remaining issue is whether the discrimination "effectively
13   bar[red] the victim's access to an educational opportunity or
14   benefit."  *Davis*, 526 U.S. at 633.  To satisfy this element, a
15   student need only establish that the sexual harassment was severe,
16   pervasive, and objectively offensive to the point that it
17   undermined and detracted from Plaintiff's educational experience
18   and that he was denied equal access to an institution's resources
19   and opportunities.  *Davis*, 526 U.S. at 651.  An evidentiary link
20   between the harassment and access to educational or related
21   services, balanced with the persistence and severity of harassment,
22   can work to establish a disadvantaged environment for the victim.
23   *Davis*, 526 U.S. at 652.  As discussed, this case involves
24   harassment that lasted for at least three days, ultimately
25   resulting in Plaintiff's withdrawal from Gustine High School.

26       The sum of the District's briefing on the issue is that
27   Plaintiff was not denied access to educational opportunity because
28   "[a]s of July 13, 2006, and at all relevant times thereafter,

1  Plaintiff was permitted to attend Gustine High School and was
2  permitted to participate on the football team [] in fact, Plaintiff
3  continued to participate on the football team after the camp."
4  (Doc. 96-2, 12:23-12:27.)  Plaintiff's single sentence response was
5  that "the unabated sexually harassing conduct effectively barred
6  the Plaintiff's access to educational opportunities or resources."
7  (Doc. 107, 21:13-21:14.)

8       The most obvious example of student-on-student sexual
9  harassment capable of triggering a damages claim involves the
10 overt, physical deprivation of access to school resources.  *Davis*
11 at 650.  It is not necessary, however, to show physical exclusion
12 to demonstrate that a student has been deprived of an educational
13 opportunity by the actions of another student.  *Id*. at 651.
14 Rather, the harassment must have a "concrete, negative effect" on
15 the victim's education or access to school-related resources.  *Id*.
16 at 654.  Examples of a negative impact on access may include
17 dropping grades, *id*. at 634, being diagnosed with behavioral and/or
18 anxiety disorders, *Theno v. Tonganoxie Unified School District No.*
19 *464*, 377 F. Supp. 2d 952, 968 (D. Kan. 1005), becoming homebound or
20 hospitalized due to harassment, *see Murrell v. School District No.*
21 *1, Denver, Colorado*, 186 F.3d 1238, 1248-49 (10th Cir. 1999),
22 physical violence, *see Vance v. Spencer County Public School*
23 *District,* 231 F.3d 253, 259 (6th Cir. 2000), or sexual assault, *see*
24 *Williams v. Board of Regents of University System of Georgia,* 477
25 F.3d 1282, 1299 (11th Cir. 2007).  Plaintiff presents evidence of
26 consistent and substantial abuse throughout the Gustine High
27 football camp, including during actual practice sessions, the free
28 periods between practices, during sleeping periods, and during

evening free periods.   These incidents allegedly occurred in Liberty High's open gymnasium, on the practice field, in the locker room, and in the showers.   Construing the evidence in Plaintiff's favor, the trier of fact could reasonably conclude that Plaintiff's ability to access Gustine High's athletic resources was sufficiently impaired and denied because of the level of harassment he received by his peers at the Gustine High football camp, at least from July 13th through July 15th.

*Doe ex rel. Doe v. Coventry Board of Education*, 630 F.Supp.2d 226 (D. Conn. 2009), ("*Coventry*"), a case where the court found a genuine issue of material fact on the issue of Plaintiff's access to her school's educational opportunities, is instructive:

> The mere fact that [Plaintiff] Mary Doe and Jesse attended school together could be found to constitute pervasive, severe, and objectively offensive harassment so as to deny Mary Doe equal access to school resources and opportunities.   The evidence shows that Jesse was permitted to continue attending school with Mary Doe for three years after the assault, leaving constant potential for interactions between the two. Although the Defendant argues otherwise, a reasonable jury could conclude that Jesse's mere presence at the high school was harassing because it exposed [Plaintiff] to the possibility of an encounter with him.

> As potential interactions between Mary Doe and Jesse are enough to preclude summary judgment in favor of the Defendant, actual interactions between the victim and her assailant could also be found to create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided to her at school.   The record shows that Mary Doe and Jesse shared a lunch period and class during their sophomore year, and shared a class together the first day of their junior year. Mary Doe testified in her deposition that: "[Jesse] was always everywhere I looked. I always had to see him."   Mary Doe also stated that her "prom memories are pretty much trashed because [she] saw [Jesse] the whole time."   A jury could reasonably conclude that the circumstances were sufficiently pervasive, severe, and objectively offensive so as to detract from Mary Doe's educational

38

experience.

*Id.* at 233. (citations omitted).

In this case, Plaintiff practiced, scrimmaged, showered, and slept with his assailants for the duration of the football camp, as well as practicing with them when he returned to practice in August 2006.[16]  Although *Coventry* presents different facts, taking the evidence in his favor, Plaintiff has presented enough evidence that, if believed by a jury, could support a finding of a denial of athletic opportunities.[17]

At oral argument, GUSD argued that Plaintiff's mother's removal of him from Gustine High in 2006 acts as a "waiver" and bars him from establishing that he was deprived access to the education opportunities or benefits provided by Gustine High.  This argument was not fully briefed by the District, therefore the impact of Plaintiff's removal from Gustine High school by his mother is unclear.  Since Plaintiff has created a triable issue of material fact as to whether he was denied access to Gustine High's resources in July 2006, prior to his removal from Gustine High in August 2006, this issue need not be resolved at this time.

3.  **Actual Knowledge**

---

[16]  (See Pl. Dep. 210:1-210:7.)

[17]  Based on the summary judgment record, a jury could reasonably conclude that the sexual assault complained of by Plaintiff, as well as the other harassing incidents he endured in July 2006, were "severe, pervasive, and objectively offensive that it can be said to deprive the [plaintiff] of access to the education opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650.

1    The third requirement is that Defendant must have actual

2 knowledge of the harassment.  In order for a funding recipient to

3 be subject to Title IX liability, "an official who at a minimum has

4 authority to address the alleged discrimination and to institute

5 corrective measures on the recipient's behalf [must have] actual

6 knowledge of discrimination." *Reese*, 208 F.3d at 739 (citation

7 omitted).[18]   "Although the actual knowledge standard has been

8 applied repeatedly by courts since *Gebser v. Lago Vista Indep. Sch.*

9 *Dist.*, its contours have yet to be fully defined." *Doe A. v.*

10 *Green*, 298 F. Supp. 2d 1025, 1034 (D. Nev. 2004); *Crandell v. N.Y.*

11 *Coll. of Osteopathic Med.*, 87 F.Supp.2d 304, 320 (S.D. N.Y. 2000)

12 (citation omitted).  "It is difficult to define what kind of notice

13 is sufficient." *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F.

14 Supp. 2d 387, 397 (E.D.N.Y. 2005) (citation omitted).

15    Plaintiff does not claim that he ever reported his own alleged

16 harassment to any GUSD official prior to Coach Cano reporting the

17 matter to Principal Shaw on July 20, 2006.  Nevertheless, Plaintiff

18 argues that Title IX's actual knowledge requirement is satisfied

19 because "Scudder admitted that he observed several of the students

20 assaulting other victims with the air pump in a sexually assaulting

21 manner." (Doc. 107, 21:18-21:20.)  Additionally, Plaintiff argues

22

23

24    [18] The Ninth Circuit has not addressed the contours of the
actual notice standard under *Gebser*. Other courts have attempted to
25 define an appropriate standard that does not require the
plaintiff-student to complain of the precise type of harassment
26 upon which the allegations are based, but which ensures that the
school had sufficient knowledge to implement remedial measures that
27 should have addressed the alleged conduct underlying the
plaintiff's claims. *See, e.g., Doe v. Alameda Unified Sch. Dist.*,
28 No. C 04-02672 CRB, 2006 WL 734348 *3 (N.D. Cal. March 20, 2006).

**40**

1    that Scudder knew of the "imminent danger" posed by the group
2    because the group assaulted, in similar fashion, more than fifteen
3    boys on the first two days of the camp.  Plaintiff contends that it
4    was impossible for Coach Scudder not to have known about the
5    repeated sexual assaults, given that they were conducted by the
6    same five-member group in an open gymnasium, the area supervised by
7    Gustine High coaches.

8         GUSD rejoins that even if it is permissible to impute Coach
9    Scudder's knowledge to GUSD, Coach Scudder did not have actual
10   knowledge of the alleged harassment during the football camp.
11   Defendant contends that the observed acts of alleged harassment
12   "did not qualify as sexual harassment" and were "of a student other
13   than Plaintiff."  (Doc. 91, 17:14-17:17.)  Defendant asserts that
14   these two distinguishing facts demonstrate the lack of disputed
15   factual issue concerning "actual knowledge" under Title IX.

16        Defendant's argument that the prior sexual assault and/or
17   conduct must be "plaintiff specific" is unsupported by current case
18   law.  Although the Ninth Circuit has not specifically weighed in on
19   the issue, recent decisions from the Fifth, Seventh, Tenth, and
20   Eleventh Circuits, as well as District Courts in Nevada and
21   California, demonstrate that Title IX's third element is satisfied
22   once an appropriate official has actual knowledge of a substantial
23   risk of abuse of students, whether or not directed at Plaintiff
24   specifically.  *See Williams,* 477 F.3d at 1293 (finding that the
25   defendants' preexisting knowledge of the harasser's past sexual
26   misconduct -- committed against people other than the plaintiff --
27   was relevant when determining whether the plaintiff had stated a
28   claim under Title IX); *Escue v. Northern Oklahoma College*, 450 F.3d

1146, 1153 (10th Cir. 2006) (stating that because "actual knowledge of discrimination in the recipient's program is sufficient, ... harassment of persons other than the plaintiff may provide the school with the requisite notice to impose liability under Title IX"); *Delgado v. Stegall*, 367 F.3d 668, 672 (7th Cir. 2004) (recognizing that, "in *Davis* the Court required knowledge only of 'acts of sexual harassment' by the [harasser], ... not of previous acts directed against the particular plaintiff"); *Doe v. Farmer*, No. 3:06-0202, 2009 WL 3768906 at (M.D. Tenn. Nov. 9, 2009) ("the actual notice required by *Gebser* is not notice that a particular plaintiff was being abused."); *Michelle M. v. Dunsmuir Joints Union School Dist.*, 2006 WL 2927485, at *6 (denying summary judgement "[i]n view of defendants' knowledge of [plaintiff's harasser's] prior behavior"); *Doe A.*, 298 F. Supp. 2d at 1033-34 (finding that liability could be based on "actual knowledge of a substantial risk of abuse to students based on prior complaints by other students"); *Johnson v. Galen Health Institutes, Inc.*, 267 F.Supp.2d 679, 688 (W.D. Ky. 2003) ("[T]he actual notice standard is met when an appropriate official has actual knowledge of a substantial risk of abuse to students based on prior complaints by other students.").

     The case law reveals no requirement that the appropriate district officials observe prior acts of a sexual nature against Plaintiff himself to establish "actual knowledge" under Title IX; rather the test is whether the appropriate official possessed enough knowledge of the harassment that he or she reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based.

1    In arguing that the circumstances of the present case create

2  a triable issue of fact on the issue of "actual knowledge,"

3  Plaintiff states that Coach Scudder personally observed the group

4  assault Kevin St. Jean, a Gustine High football player, with an air

5  hose.  Plaintiff characterizes the attack as "a sexual assault" in

6  that the group of boys "were trying to stick an air mattress pump

7  nozzle up someone's shorts." (Reporter's Transcript ("RT"), August

8  10, 2009, 19:13-19:17.)   Defendant maintains that "there was

9  nothing sexual — from Scudder - Coach Scudder's point of view,

10 there was nothing sexual involved." (Id. 18:23-18:25.)

11   Coach Scudder's deposition testimony demonstrates that he knew

12 about the assault on St. Jean on July 14, 2005; that he witnessed

13 the incident, but considered it "childish behavior" warranting only

14 a verbal reprimand.   The deposition testimony further indicates

15 that Coach Scudder witnessed the boys run across the gym, attack

16 St. Jean on his bed, restrain his arms and legs, and attempt to

17 insert a battery-operated air pump up St. Jean's shorts:

18   Q.   After the coaches' meeting, did you back inside the
          gym?
19
     A.   I did.
20
     Q.   And did you see anything unusual?
21
     A.   That time I did.  As I was entering the — entering
22        into the foyer into the gymnasium, I saw a group of
          four or five football players, Gustine high
23        football players, running across the gym, and they
          ended up all together at another young man's air
24        mattress.   They were holding him down.   He was
          sitting on his mattress, and it was a couple on his
25        arms, couple on his feet, and I believe it was Kyle
          Simmons had the air pump and he was blowing it up
26        the front of Kevin St. Jean's shorts [...]

27   Q.   Okay.   You saw this group of boys running across
          the gym?
28

                                43

1    A.    Uh-huh.

2    Q.    Were they chasing Kevin St. Jean

3    A.    No.  Kevin was sitting down on his bunk at the time
           or sitting down on his air mattress at the time.
4

5    Q.    How far did you see this group of boys run?

6    A.    They were already past mid court when I came into
           the gym, so it was maybe 20 feet, 25 feet.

7    Q.    And St. Jean was sitting on his mattress --

8    A.    Sitting.

9    Q.    -- at the time.  And this group of boys ran over to
           him on his mattress.
10

11   A.    Yes.

12   Q.    And what did they do?

13   A.    As I said, they grabbed his arms and his legs, and
           I was yelling for them to stop, I saw Kyle lift his
           shorts and blow air up the leg of his shorts.
14

15   Q.    Kyle Simmons did that?

16   A.    Yes.

17   Q.    Were -- was this a situation where one of these
           boys was holding one arm, another another arm?

18   A.    Basically, yes.

19   Q.    So they had him spread?

20   A.    They didn't have him spread down.  I mean, he was
           sitting there.  They had his arms pinned to the
21         side, and his knees were down, so they had his legs
           on the air mattress.
22

23   Q.    So he couldn't move basically?

24   A.    Kevin was a strong kid.  He could have moved, but
           he was just, what are you guys doing, you're being
25         idiots.  The look on his face was like what are you
           doing?
26
     Q.    And it was Kyle who put the air mattress pump
27         inside his shorts?

28   A.    I believe so, yes.

**44**

(Scudder Dep. 152:2-154:19.)

Here, there are two conflicting interpretations on whether the St. Jean incident provides "actual knowledge" of actionable conduct under Title IX.  Defendant characterizes the event as "horseplay" or "kids just being kids."  This is contrary to Plaintiff's experience in the incident.  According to Plaintiff, Coach Scudder had actual knowledge of sexual discrimination based on the participants at issue, the similarity of other assaults, the use of force by the perpetrators, the positioning of the victim while he was assaulted, and the attempt to place a battery operated device up the shorts of a restrained individual.

On the current record, taking the evidence in Plaintiff's favor, whether this conduct was sexual in nature or was instead indicative of childish behavior gone too far is a function of intent and cannot be resolved.  The total dispute over the sexual nature of the St. Jean assault precludes an entry of summary judgment in this case.

Under the Supreme Court's Title IX analysis, a school district's opportunity to respond and remedy a situation depends on its actual notice of the alleged discrimination; if it is unclear whether the predicate of that knowledge is sexual in nature, that dispute must be considered when determining the district's liability or, in this case, whether to grant or deny summary adjudication.  Defendant's argument is similar to the argument raised in *Brodeur v. Claremont School District*, 626 F. Supp. 2d 195 (D.N.H. 2009):

> The District acknowledges that the sexual harassment policy was not followed, but maintains that Couture's response was still not clearly unreasonable because he

1
2

> did not view the comments as sexual harassment.  The best that can be said of this argument for the moment is that a jury could rationally find otherwise [....]

3
4

*Id.* at 211-12 (quotations omitted).

5
6
7
8
9

Viewing the facts in a light most favorable to Plaintiff, a reasonable finder of fact could conclude that the St. Jean episode was sexually-motivated and that Coach Scudder "possessed enough knowledge of the harassment that [he or she] reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based."[19]

10
11
12
13
14
15
16
17
18
19
20
21
22

The potential difficulties inherent in assessing the attack on Kevin St. Jean on July 15, 2006 demonstrate why the resolution of this issue depends on how the facts are ultimately determined by the trier of fact.  According to Plaintiff, the St. Jean assault provided Defendant with sufficient notice of "at least some incidents of harassment in order for liability to attach." Defendant characterizes the incident as horseplay among young men and deny any sexual connotation or connection.  Given the dispute over the proper factual interpretation of the St. Jean incident, which provides the underlying basis for Title XI liability, summary adjudication is not appropriate.  A jury must decide whether Coach Scudder's observations on the afternoon of July 14, 2006 constitute

23
24
25
26
27
28

---

[19] To further establish a triable issue of fact, Plaintiff challenges that "Scudder and other GUSD coaches saw much more of the hazing and sexual harassment committed by the players than they will readily admit."  (Doc. 107, 21:21-21:24.)  However, as Defendant correctly argues, Title IX liability does not attach liability simply because a school or district "should have known" about sexual and/or gender discrimination. *See, e.g., P.H. v. Sch. Dist. of Kansas City, Mo.*, 265 F.3d 653, 663 (8th Cir. 2001) (citation omitted).

actual knowledge under Title IX.[20]

This does not end the inquiry.  A school district can be held liable under Title IX only if an appropriate person had knowledge of the abuse.   The Supreme Court in *Gebser* stated that an "appropriate person" is, "at a minimum, an official of the [school district] with authority to take corrective action to end the discrimination."   524 U.S. at 290.   This person must be able to "address the alleged discrimination and to institute corrective measures."  *Id*.

Plaintiff argues that the inaction of a teacher or coach can give rise to Title IX liability, relying primarily upon *Nicole M v. Martinez Unified School District*, 964 F. Supp. 1369 (N.D. Cal. 1997).   Plaintiff contends that "[a]lthough no cases were found regarding whether a teacher is a person whose knowledge can be imputed to the district, it would appear that if the school district has a policy which addresses sexual harassment in athletics, and which policy designates the head coach and teacher with the authority to take corrective measures, then the person so designated should be an appropriate person."  (Doc. 107, 22:9-22:13.)   Defendant rejoins only that "Plaintiff concedes that

---

[20] The District argues that the St. Jean incident "did not qualify as sexual harassment" and "was not severe and pervasive conduct."  The District's first point represents its legal opinion that the conduct did not reach the level of notice required to meet *Davis*' standard.  Defendant's subjective factual interpretations are not dispositive of claims at the summary judgment stage. Though this is a close case and the evidence of actual notice is predominantly based on Scudder's observations of the St. Jean incident, Plaintiff has marshaled enough evidence to raise a genuine issue of material fact regarding GUSD's actual knowledge of sexual harassment/discrimination in July of 2006.

1  Defendant Scudder did not have actual notice of alleged harassment

2  of Plaintiff, therefore whether Scudder is an appropriate person is

3  immaterial."   (Doc. 116, 17:18-17:20.)

4       Although the issue is not thoroughly briefed by the parties,

5  *Annamaria M v. Napa Valley Unified School Dist.*, 2006 WL 1525733,

6  is instructive:

7          In *Nicole M*, Judge Patel decided — as a matter of
           first impression in the Ninth Circuit and in the
8          pre-*Gebser/Davis* Title IX landscape — that peer
           harassment is actionable under Title IX. As one basis
9          for her decision, Judge Patel reasoned that a "teacher
           whose agency status is sufficient to hold the district
10         liable for her harassment of a student stands in no
           different position when she knows of peer sexual
11         harassment."  Significantly, no teacher was named as
           a defendant in *Nicole M*, which relegates this language
12         to the status of obiter dicta.  Of more fundamental
           importance, however, Judge Patel's rationale was
13         explicitly based on agency principles. Intervening
           Supreme Court authority makes clear that Title IX
14         liability cannot be imputed to a school district
           merely on the basis of agency principles. Rather,
15         Title IX liability can be predicated only upon the
           acts or omissions of "an official who at a minimum has
16         authority to address the alleged discrimination and to
           institute corrective measures on the recipient's
17         behalf has actual knowledge of the discrimination."

18         Unsurprisingly, then, the Eleventh Circuit has
           recognized that it is "an open question" whether a
19         teacher's deliberate indifference can trigger Title IX
           liability after Davis.  The Tenth Circuit has opined
20         that when peer harassment occurs on school grounds,
           "teachers may well possess the requisite control
21         necessary to take corrective action to end the
           discrimination."    Still, the Tenth Circuit
22         acknowledged that "[b]ecause officials' roles vary
           among school districts, deciding who exercises
23         substantial control for the purposes of Title IX
           liability is necessarily a fact-based inquiry."  "In
24         order to answer the question, it would be necessary to
           examine how [California] law organizes its public
25         schools, the authority and responsibility granted by
           state law to teachers, the school district's
26         discrimination policies and procedures, and the facts
           and circumstances of the particular case."

27

*Id*. at *3-4 (citations omitted).

28

1    Case law does not expressly limit the employee who may trigger
2    a school district's liability under Title IX; it is an "open
3    question." *See, e.g., Hawkins v. Sarasota County Sch. Bd.*, 322
4    F.3d 1279, 1286 (11th Cir. 2003) ("We likewise consider the issue
5    of whether notice to a teacher constitutes actual knowledge on the
6    part of a school board to be open."). School districts are liable
7    if "an employee who has been invested by the school board with
8    supervisory power over the offending employee actually knew of the
9    abuse, had the power to end the abuse, and failed to do so."
10   *Gebser*, 524 U.S. at 280. "[S]chool districts contain a number of
11   layers below the school board: superintendents, principals,
12   vice-principals, and teachers and coaches, not to mention
13   specialized counselors such as Title IX coordinators. Different
14   school districts may assign different duties to these positions or
15   even reject the traditional hierarchical structure altogether."
16   *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 660 (5th
17   Cir. 1997). Because officials' roles vary among school districts,
18   deciding who exercises substantial control for the purposes of
19   Title IX liability is necessarily a fact-based inquiry.

20   Here, Coach Scudder was employed by GUSD as the head varsity
21   football coach and a teacher. At the time of the camp, Gustine
22   High did not employ an athletic director, which may have created an
23   administrative void between the head football coach and the
24   principal. The record demonstrates that Scudder formulated every
25   aspect of the Gustine High football program, as well as the July
26   2006 football camp. He was the chief administrator and
27   disciplinary authority over the football program. As to the July
28   2006 football camp, Scudder acted as an administrative proxy

49

between the football program and GUSD, obtained approval for the athletes' transportation (by GUSD buses) and overnight "field trip" status, prepared and requisitioned permission slips, determined eligibility criteria, formatted attendance of both athletes and coaches, and was admittedly responsible for the athletes "on and off the field." He also conducted the football aspects of the camp, interacted with boosters, and was considered the "school personnel in charge" under GUSD's Administrative Directive.    On the present record and without evidence from the District, it cannot be established as a matter of law that Coach Scudder was not an "appropriate person" for purposes of Title IX.[21]

### 4.   Deliberate Indifference

Defendant argues that they are entitled to summary adjudication on the issue of deliberate indifference because, as a matter of law, its response once learning of Plaintiff's assault was not "clearly unreasonable." Defendant contends that via its employees and administrators, the district followed its sexual harassment and gender harassment/discrimination policies, which resulted in an investigation of Plaintiff's allegations and, ultimately, expulsion of the offending students.    Plaintiff's

---

[21] The *Davis* court did not explicitly discuss the role of the school employee who must know about harassment by a fellow student before it is actionable, but held that notice of harassment to the principal and two teachers was deemed sufficient to support a cause of action under Title IX.    In dissent, Justice Kennedy suggested that in most cases of student misbehavior it is the teacher, at least in the first instance, who has authority to punish the offender and remedy the harassment.    *Davis*, 526 U.S. at 679 (Kennedy, J., dissenting).

1  opposition to summary adjudication focuses on different issues.
2  While Plaintiff concedes that GUSD investigated Plaintiff's assault
3  and later expelled the responsible students, he maintains that
4  GUSD's response violated Title IX - and was deliberately
5  indifferent - because it was "too little too late."  Plaintiff also
6  rejoins that Coach Scudder had actual knowledge of the sexual
7  harassment - by virtue of observing the St. Jean incident -, but
8  did not comply with the requirements of Title IX in that he failed
9  to "take corrective action to end the discrimination."

10      A school district is liable for damages under Title IX only
11 where the district itself remains deliberately indifferent to known
12 acts of harassment.  *Davis*, 526 U.S. at 642-43.  The Supreme Court
13 spent much of its *Davis* opinion emphasizing the limits on its
14 "deliberate indifference" holding, rejecting any suggestion that is
15 was imposing a reasonableness standard on school administrators:
16 "On the contrary, the recipient must merely respond to known peer
17 harassment in a manner that is not clearly unreasonable." *Id.* at
18 648-49.  The Supreme Court cautioned that "courts should refrain
19 from second-guessing the disciplinary decisions made by school
20 administrators," *id.*, and stressed that its holding "does not mean
21 that recipients can avoid liability only by purging their schools
22 of actionable peer harassment or that administrators must engage in
23 particular disciplinary action."  *Id.* at 648.

24      "Deliberate indifference" is more than a "mere reasonableness
25 standard that transforms every school disciplinary decision into a
26 jury question," *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195
27 F.3d 134, 141 (2d Cir. 1999), and "describes a state of mind more
28 blameworthy than negligence." *Farmer v. Brennan*, 511 U.S. 825, 835

1   (1994).   But "deliberate indifference" is also "satisfied by
2   something less than acts or omissions for the very purpose of
3   causing harm or with knowledge that harm will result." *Id*.
4   "Deliberate indifference will often be a fact-laden question," for
5   which bright lines are ill-suited.   *Doe v. Taylor Indep. Sch.*
6   *Dist.*, 15 F.3d 443, 457 n.12 (5th Cir. 1994); *see also Doe A. v.*
7   *Green*, 298 F.Supp.2d at 1035-36 n.4 (stating that no bright line
8   rule in Ninth Circuit cases defines "deliberate indifference," and
9   from review of cases outside Ninth Circuit, "it is clear that most
10  courts have similarly not discovered such a bright-line").

11       In his opposition, Plaintiff maintains that summary
12  adjudication is inappropriate because "GUSD's response and remedial
13  measures after the camp were too little too late."   (Doc. 102,
14  24:9-24:10.)   Plaintiff alleges that a factual dispute concerning
15  deliberate indifference exists because Coach Cano waited 24 hours
16  to call Principal Shaw after he overhead two players discussing
17  what happened to Plaintiff at the football camp.   Plaintiff also
18  contends that Principal Shaw was deliberately indifferent when he
19  waited two days to meet with Coach Cano and several more days
20  before he contacted the police.   At oral argument, Plaintiff's
21  counsel argued that Coach Cano and Principal Shaw's response to
22  hearing about the incident on July 13, 2005 constituted deliberate
23  indifference:

24   Counsel:   Because I'm not so sure that whether Coach Souza
             actually saw these incidents occurring makes a
25           difference.   Because it goes further than that to
             what the district and its employees did after the
26           camp.   We know within a few days of the camp
             Coach Cano had actual knowledge of what happened
27           to the plaintiff.

28   Court:     Right.   He reported it to the principal a day

later, as I understand it [...] [a]nd then it
took a few days for the principal to start the
process.  And eventually all the boys were
expelled.

Counsel:   Well, it's a little more egregious than that,
Your Honor.  Because Coach Cano overhears this
conversation about what happened to Plaintiff,
the principal tells him, okay, we'll meet in
person the next time I'm in Gustine because he
lives in Merced and didn't want to come to
Gustine.  So a couple more days pass.  Cano
finally meets with the principal. We think that
was still in the first week.  And then they sit
on it for a couple more days until the following
week.  And the only, after parents started
contacting the school, did the district do
anything about this.  So you have at least a week
delay between when Cano had actual knowledge of
what happened to plaintiff and the time that
anything is reported to the police [...]

(RT, August 10, 2009, 13:5-14:6.)

     The record reveals that following the 2006 football camp,
Coach Cano led practice while Coach Scudder was at an all-week
conference.  During practice, Coach Cano overheard a player, Jake
Filippini, tell another player that, while at the summer football
camp, Plaintiff was held down and an air pump was inserted his
rectum.  The following day, Coach Cano called Principal Shaw and
told him that they needed to meet in-person to discuss "a matter
that might have happened at the football camp."  Cano and Principal
Shaw met at the school two days later, at which time Cano repeated
Filippini's statement to Shaw.  Approximately five days later,
Principal Shaw contacted the Gustine Police Department concerning
the incident.  The offenders were removed from the football team on
July 25, 2006 and GUSD instituted disciplinary proceedings against

1  them.[22]

2  **Although Plaintiff takes issue with GUSD's response –
3  primarily with the pace of Coach Cano and Principal Shaw's
4  investigation, as well as law enforcement and parental notification
5  – reasonable delay by school officials in dealing with alleged
6  sexual harassment does not equal deliberate indifference. *See Oden
7  v. N. Marianas Coll.*, 440 F. 3d 1085 (9th Cir. 2006). Although the
8  offenders were allowed to continue practicing until July 25th,
9  2006, the timeframe is not necessarily "clearly unreasonable,"
10  especially given the lack of direct corroboration concerning the
11  conduct at issue, the multiple layers of administrative
12  involvement, and the sensitive nature of the accusations. *See
13  Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999) (stating that
14  if a funding recipient "takes timely and reasonable measures to end
15  the harassment, it is not liable under Title IX for prior
16  harassment.").[23]**

17  **Plaintiff, however, contends that Coach Scudder's response to**

18

19

20  [22] The record indicates that expulsion proceedings were
instituted against the offenders within two months of the Coach
Cano learning about the incident. Specifically, on September 12,
2006, GHS revoked Michael and Kyle Simmons' inter-district
transfers, and officially expelled the twins from GHS in October
2006. McKimmie and San Felippo were both expelled from GHS for two
semesters.

24  [23] In this case, if Coach Cano and Principal Shaw's actions
were the only conduct at issue, it is possible that Defendant GUSD
could have met its Rule 56 burden and demonstrated, as a matter of
law, that no genuine issue of material fact existed as to
deliberate indifference. However, GUSD's conduct must be viewed in
light of the conduct of its employees, coaches, and administrators,
including whether Coach Scudder acted with deliberate indifference
after witnessing Kevin St. Jean's assault on July 15, 2006.

the St. Jean incident was clearly unreasonable in light of the known circumstances.[24]  Plaintiff points to evidence in the record that shows, among other things, that Coach Scudder knew that one of the Simmons brothers' interdistrict transfer was in limbo following disciplinary problems; that Tommy San Felippo was suspended for fighting prior to the football camp; that a number of students brought air mattress pumps to the camp, including the Simmons brothers; and that "something unusual" was going on with the Simmons brothers, San Felippo, McKimmie, and Figueroa on the afternoon of July 14, 2006.  The summary judgment record also demonstrates that Coach Scudder observed the Simmons brothers, San Felippo, McKimmie, and Figueroa run across the gym and assault Kevin St. Jean with an air hose on July 14, 2006.

Once he observed the St. Jean assault, the record reveals that Coach Scudder verbally admonished the group and told them they were being "childish;" and that he confiscated the air pump from Kyle Simmons and placed it with his own personal belongings.  However, Coach Scudder stated in his deposition that the confiscated air pump "was sitting next to all my stuff, and it was there where somebody could have come by and picked it up and used it again, put it back [...] yes, it was in the open."

Plaintiff also points to Coach Scudder's deposition testimony,

---

[24] Given the factual dispute over whether Coach Scudder had "actual knowledge" and whether he was an "appropriate person" for purposes of Title IX, GUSD's conduct must be viewed in light of the conduct of its employees, coaches, and administrators, including whether Coach Scudder acted with deliberate indifference after witnessing Kevin St. Jean's assault on July 15, 2006.

which he argues demonstrates deliberate indifference:[25]

> Q:   Did you report this incident to any of these kids'
>      parents?
>
> A:   I did not.
>
> Q:   Did you talk to any of the other coaches about this
>      incident while you were at the camp?
>
> A:   No.
>
> Q:   This is probably a variation of the same question,
>      but did you ask Coach Souza if he had seen anything
>      happen with the pump while you were at the camp?
>
> A:   I did not.

(Scudder Dep. 158:24-159:14.)

The record also shows that many of the assaults occurred in Liberty High's open gymnasium on July 14, 2006, an area which was admittedly supervised by Gustine High coaches; that the five assailants openly chased their victims, held them down and attempted to assault the students with an air pump; that their victims attempted to evade capture and openly struggled.  It also appears that the assaults escalated following the St. Jean assault, culminating in the assault on Plaintiff.  According to the record, Gustine High coaches neither witnessed this conduct nor heard "rumors" that such behavior took place.

Both parties attempt to draw factual distinctions and

---

[25] Plaintiff also points to the GUSD Administrative Directive, applicable to the July 2006 football trip, and requires school personnel and chaperones to "ensure proper supervision of the students" and to "immediately notify the school personnel in charge of the trip if any suspicious or inappropriate behavior is observed."   (Doc. 105, Exh. I (emphasis added).)   The administrative directive also provides that "there shall be one chaperone or school employee per ten students," which Plaintiff argues was not followed by GUSD or Coach Scudder.

1  comparisons between this case and others in an attempt to support
2  their contentions as to whether Scudder's conduct constitutes
3  deliberate indifference.  (See Doc. 107, 23:4-25:2; Doc. 116, 18:5-
4  19:13.)  The cited cases, however, only outline the boundaries of
5  what may or may not constitute "deliberate indifference,"
6  discussing the sorts of circumstances under which a court may rule
7  that a particular response was or was not "clearly unreasonable" as
8  a matter of law; they do not offer a bright-line rule defining what
9  constitutes a "clearly unreasonable" response to known harassment
10 or discrimination in violation of Title IX.  Whether a particular
11 response is deliberately indifferent, the inquiry is whether the
12 response was clearly unreasonable in light of the known
13 circumstances to remedy the violation that had occurred.  Here,
14 Coach Scudder did not wholly fail to act in response to the St.
15 Jean incident.  He confiscated the air pump and verbally
16 reprimanded the offenders.  However, he did not investigate the
17 conduct, did not inquire with or report the incident to other
18 coaches/chaperones, and did not take measures to avoid recurrence.
19 As to Coach Cano and Principal Shaw, they commenced an
20 investigation into the July 2006 football camp more than a week
21 after learning of Plaintiff's assault; however, the offenders
22 continued to practice with their victims/teammates during this
23 time.  The question is whether those responses "could not have
24 reasonably been expected to remedy the violation," i.e., whether
25 Scudder, Cano, and Shaw's responses were "clearly unreasonable."
26 In light of the known circumstances that occurred during the
27 football camp, and taking the evidence in Plaintiff's favor, it
28 cannot be determined as a matter of law that GUSD's response was

not clearly unreasonable.[26]

Although arising from a teacher-student harassment case, *Doe A* is instructive.  In finding that the case "did not lend itself well to summary adjudication," *Doe A* noted that the question of whether an institution acted with deliberate indifference under a particular set of circumstances is a question normally left to the jury.  298 F. Supp. 2d at 1036 (*citing, e.g.*, *Oviatt By and Through Waugh v. Pearce*, 954 F.3d 1470, 1478 (9th Cir. 1992) ("Whether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury.")); *Davis v. Mason County*, 927 F.2d 1473, 1482 (9th Cir. 1991); *Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994); *Blair v. City of Pomona*, 206 F.3d 938, 2000 WL 290246, at *5 (9th Cir. 2000); *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001).  A number of "[o]ther district courts have found that the deliberate indifference or clearly unreasonable standard does not lend itself well to a determination by the Court on summary judgment, and have permitted the claim to go to the jury if the plaintiff advanced some evidence in support." *Id.* (citing *Hart v. Paint Valley*, 2002 WL 31951264, at *4 (S.D. Oh. 2002) (stating that whether a response is unreasonable under Title IX "does not lend itself well to a determination by the Court on summary judgment")).  Here, there is evidence in the record to support a

---

[26] "A school acts appropriately if it investigates what has already occurred, reasonably tries to end any harassment still ongoing by the offenders, and seeks to prevent the offenders from engaging in such conduct again." *Patterson v. Hudson Area Schools*, 551 F.3d 438, 460 (6th Cir. 2009).  Here, during the camp Coach Scudder's actions were ineffective.

finding that Coach Scudder did not take appropriate or effective remedial measures after his observations of sexual harassment.  As a result, a rational trier of fact could conclude that Scudder's response of a verbal warning about "childish behavior," without more, was clearly unreasonable when there is sufficient evidence in the record to support a claim that Scudder was on notice that the offenders were sexually assaulting players with an air hose.

Construing the record and reasonable inferences therefrom in the light most favorable to Plaintiff, a trier of fact could also find that Scudder had "actual notice" on the afternoon of July 14, 2006.  It appears from the record an investigation on July 14 or July 15, 2006 would have elicited the same findings the police and district investigations later revealed, and could have prevented the sexual assault against Plaintiff, as well as assaults against several other Gustine High players.  A question of material fact exists as to to whether GUSD exhibited deliberate indifference. Summary judgment is DENIED on the Title IX claim.

As detailed in §§ V(C)(1)-(4), *supra*, Defendant GUSD has not provided sufficient evidence to either negate an essential element of Plaintiff's Title XI claim nor shown that Plaintiff does not have sufficient evidence to carry his ultimate burden of persuasion at trial.  Defendant GUSD's motion for summary adjudication on Plaintiff's Title IX claim is DENIED.

### D.   State Law Claims

Plaintiff brings several state law claims against Defendants Gustine Unified School District, Jason Spaulding, Anthony Souza, Adam Cano, and Carl Scudder:  intentional infliction of emotional

59

distress (Claim V), violation of Cal. Constitution, art. 1, § 7(a) (Claim VI), violation of Cal. Civil Codes §§ 51, 51.7 and 52.4 (Claims VII-IX), sex discrimination under the Cal. Education Code (Claim X), negligent supervision (Claim XIII), negligence per se (Claim XIV), and negligent training (Claim XV).

The Eleventh Amendment's bar against suing an arm of the state in federal court applies equally to federal and state law claims. *See Durning v. Citibank, N.A.*, 950 F.2d 1419, 1422-23 (9th Cir. 1991) ("Although by its terms the Eleventh Amendment only withholds article III jurisdiction from cases predicated upon citizen-state diversity, the Supreme Court has judicially extended its reach to bar federal courts from deciding virtually any case in which a state or the arm of a state is a defendant – even where jurisdiction is predicated upon a federal question – unless the state has affirmatively consented to suit.") (internal quotations omitted); *see also Pena v. Gardner*, 976 F.2d 469, 473 & n.6 (9th Cir. 1992) (discussing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117-23 (1984)).

As Gustine Unified School District is an arm of the state, it is protected by the Eleventh Amendment and is immune from Plaintiff's state law claims in this Court. The Eleventh Amendment does not, however, bar Plaintiff's claims against the individual defendants because, for the reasons discussed *supra*, they are sued in their individual capacity. *See Stoner v. Santa Clara County Office of Educ.*, 502 F.3d 1116, 1125 (9th Cir. 2007).

Defendants Jason Spaulding, Anthony Souza, Adam Cano, and Carl Scudder argue they are entitled to immunity on Plaintiff's state

law claims pursuant to California Education Code § 35330.[27]   The relevant portions of § 35330 provide:

> **(a) The governing board of a school district or the county superintendent of schools of a county may: (1) Conduct field trips or excursions in connection with courses of instruction or school-related social, educational, cultural, athletic, or school band activities to and from places in the state, any other state, the District of Columbia, or a foreign country for pupils enrolled in elementary or secondary schools.**
>
> **[....]**
>
> **(d) All persons making the field trip or excursion shall be deemed to have waived all claims against the district, a charter school, or the State of California for injury, accident, illness, or death occurring during or by reason of the field trip or excursion.**

Cal. Educ. Code. § 35330(a),(d).

Defendants argue that § 35330(d) provides immunity to school districts, charter schools, and the State of California for injuries occurring during a "field trip" or "excursion." Defendants maintain that the July 2006 football camp is a "field trip" or "excursion" under § 35330 because the camp: (a) was a school-related athletic activity,[28] (b) was voluntary, (c) Plaintiff

---

[27] California case law has confirmed that individual teachers fall within the immunity protections of § 35330. *See Casterson v. Superior Court,* 101 Cal. App. 4th 177, 186-190 (2002) ("it is consistent with legislative intent to construe section 35330 as extending field trip immunity to school district employees in order to protect a school district from vicarious liability for an employee's alleged negligence in the course and scope of employment during a field trip.").

[28] As opposed to a "school-sponsored activity," which is defined as an activity "that requires attendance and for which attendance credit may given." *Myricks v. Lynwood Unified Sch. Dist.*, 74 Cal. App. 4th 231, 239 (1999).  If a student is injured while off-campus for a school-sponsored activity, the student's

did not receive a grade or credit for his attendance, and (d) is consistent with § 35330's legislative intent to "protect school districts from exposure to personal injury claims arising from field trips."

Plaintiff argues that § 35330(d)'s statutory immunity is inapplicable to the facts of this case because § 35330(d) "applies only to field trips or excursions occurring off school premises." (Id. at 11:12-11:14.) According to Plaintiff, because "the alleged assault and hazing at issue in this litigation occurred on LHS school grounds ... the camp was not a field trip or excursion to which the immunity of Section 35330(d) applies." (Id. at 11:8-11:18.) Plaintiff essentially argues that GUSD or GHS constructively owned the Liberty High School for purposes of analyzing § 35330.

Plaintiff also contends that § 35330(d) does not apply because: (a) school was not in session at the time of the camp; and (b) case law demonstrates that the proper legal inquiry is not whether the trip was "voluntary," but rather "whether the trip had the ear markings of a field trip or an excursion," based on compliance with internal district guidelines.

In the context of public schools, the California Legislature has established different rules for injuries occurring during required school-sponsored, off-premises activities, on the one hand (Cal. Ed. Code § 44808), and filed trips or excursions, on the other hand (Cal. Ed. Code § 35330). If a student is injured while

---

injury is treated, for liability purposes, in the same manner as an on-campus injury. *Id*.

off campus for a school-sponsored activity, which is defined as an activity "that requires attendance and for which attendance credit may be given," the student's injury is treated, for liability purposes, in the same manner as an on-campus injury. *Myricks v. Lynwood Unified Sch. Dist.*, 74 Cal. App. 4th 231, 239 (1999); *see also Ramirez v. Long Beach Unified Sch. Dist.*, 105 Cal. App. 4th 182, 189 n.2 (2002). "Students who are off of the school's property for required school purposes are entitled to the same safeguards as those who are on school property, within supervisorial limits." *Id.*

However, if a student is injured while on a field trip or excursion in connection with courses of instruction or school-related social, educational, cultural, athletic, or school band activities he "shall be deemed to have waived all claims against the district or the State of California for injury, accident, illness, or death occurring during or by reason of the field trip or excursion." Cal. Educ. Code, § 35330(d); *Myricks,* 74 Cal. App. 4th at 239. "Field trip" is defined within the meaning of § 35330 as "a visit made by students and usually a teacher for purposes of first hand observation (as to a factory, farm, clinic, museum)." *Wolfe v. Dublin Unified School Dist.*, 56 Cal. App. 4th 132-133. "Excursion" means a "journey chiefly for recreation, a usual brief leisure trip, departure from a direct or proper course, or deviation from a definite path." *Id.*

In *Casterson v. Superior Court*, 101 Cal. App. 4th 177 (2002), the court provided an in-depth review of the legislative history:

> Our review indicates that the Legislature was concerned that the financial costs of field trips not burden school districts [....] [¶] From these

> legislative history materials, we discern that one
> aspect of the Legislature's intent in enacting former
> section 1081.5 in 1967 was to authorize school field
> trips upon the condition that no public funds be
> expended for the trips. We further discern that the
> waiver provision was added in furtherance of this
> purpose, because it prevents school district exposure
> to personal injury claims arising from field trips.
> This intent is apparent throughout the amendments to
> field trip immunity provisions of former section
> 1081.5 and section 35330, since the waiver provision
> has been carried over in each amendment with only
> slight changes.

*Id.* (citations omitted).

Prior to *Casterson*, *Castro v. Los Angeles Bd. of Education* 54 Cal. App. 3d 232 (1976), noted:

> The Legislature, by these sections, recognized that:
> Not all educational facilities can be provided within
> the confines of each school's property. To accomplish
> a school's educational aims, it therefore is necessary
> for students to accomplish portions of their study off
> the school's property. Students who are off of the
> school's property for required school purposes are
> entitled to the same safeguards as those who are on
> school property, within supervisorial limits.
> Students who participate in nonrequired trips or
> excursions, though possibly in furtherance of their
> education but not as required attendance, are
> effectively on-their-own; the voluntary nature of the
> event absolves the district of liability.

*Id.* at 236.

Although Plaintiff contends that a school-organized football camp is not a "field trip" or "excursion" within the meaning of § 35330, several California cases in which immunity was found to exist control the facts of this case.

In *Myricks,* 74 Cal. App. 4th 231, a case cited by Defendants, several high school basketball players on a summer tournament road trip were injured when, traveling between games, the car of the volunteer driver with whom they were riding drove off the road.

64

The students claimed the summer league was a school-sponsored activity for which the school district could be liable. The District asserted that the summer trip was not school-sponsored and that California's field trip immunity precluded holding the District liable for the players' injuries. *Myricks* found that the summer basketball trip was "not a school-sponsored activity for which attendance was required and attendance credit given" and, assuming the trip was school related at all, the "waiver provisions of Education Code section 35330, subdivision (d) must control." *Id*. at 240.

*Barnhart v. Cabrillo Community College*, 76 Cal. App. 4th 818 (2002), involved a lawsuit by three members of a community college soccer team against the college and their coach for personal injuries suffered in an automobile accident that occurred when the coach, a college employee, was driving plaintiffs from their college to a game in a van owned by the college. At issue in *Barnhart* was whether California Code of Regulations, title 5, § 55450, provided field trip immunity to community college districts in language identical to the field trip immunity for school districts set forth in § 35330:

> Strictly speaking, plaintiffs' trip to Fresno does not appear to be a field trip given that it was a trip to participate rather than observe; and, though the trip had recreational and pleasurable aspects, the essence of the trip was not excursionary given that the trip was part of a regular activity rather than a departure or deviation from the norm.

> But title 5, section 55450 itself further describes field trips or excursions. The section supposes that field trips or excursions are conducted "in connection with ... school-related ... athletic ... activities." (tit. 5, § 55450, subd. (a).) School-related athletic activities necessarily include extracurricular sports programs. Thus, by its own terms, title 5, section

> 55450 places trips in connection with extracurricular
> sports programs into the narrowly defined field trip
> or excursion type of school-sponsored activity.
>
> Plaintiffs were therefore on a field trip or
> excursion; hence, the special or specific immunity
> statute applies.

*Id.* at 828-829.

Although *Myricks* and *Barnhart* did not specifically deal with students suffering injuries on a "co-sponsor's school property," the issues are substantially the same. The summary judgment record demonstrates that Gustine students were participating in an athletic event on Liberty High property. Gustine Unified School District does not own or otherwise hold an interest in Liberty High School. Like traveling to an away game in *Barnhart* or traveling between tournament games in *Myricks*, the students here were off-campus, participating in a school-related athletic function. Even if Liberty High School were somehow affiliated with Gustine Unified School District, *Anderson v. Cornn*, No. F042137, 2004 WL 396439 (Cal. App. 5 Dist. Mar. 4, 2004) ("*Cornn*"), an unpublished decision,[29] found that § 35330 applies if students have left "their regular school grounds" and are "having their field trip on what may or may not be other [District] property."[30]

---

[29] The Ninth Circuit has stated that "we may consider unpublished state decisions, even though such opinions have no precedential value." *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003) (citation omitted).

[30] In *Cornn*, a junior high student alleged that he was injured while at a summer camp promoted by his school. Plaintiff brought claims for negligence against the camp leader and District, alleging that the camp leader, "threw [him] to the ground, held him on his back, and struck him, forcibly, in his chest three (3) times

1    **Plaintiff distinguishes *Myricks*, *Barnhart*, and *Cornn*, arguing**

2    **that "none of the cases [...] support the proposition that a school**

3    **sponsored event which occurred outside of the school year and where**

4    **student attendance is not credited, is the type of field trip or**

5    **excursion that was contemplated by Section 35330."   (Doc. 107,**

6    **15:4-15:9.)  Plaintiff is incorrect.  *See Myricks,* 74 Cal. App. 4th**

7    **231 (applying § 35330 to a summer basketball tournament); *Elbaz v.***

8    ***Beverly Hills Unified Sch. Dist.*, No. B195563, 2007 WL 1545921**

9    **(Cal. App. 2 Dist. May 30, 2007)(stating "[w]e conclude that his**

10   **claims against [the District] have been waived pursuant to section**

11   **35330, subdivision (d).   As a matter of law, the tournament**

12

13   and thereafter stated words to the effect 'Now how does that
14   feel.'" *Id*. at *1.  *Cornn* affirmed summary judgment in favor of the
     District, finding that § 35330 precluded liability:

15
16          Defendants provided undisputed evidence that the trip
            was entirely voluntary [...] As stated above, this was
17          undisputedly a field trip [] Castro reaffirms that
            section 35330 precludes liability for a school
18          district when a student is participating in
            "nonrequired trips or excursions."  Under such
19          circumstances, students are "effectively on their own;
            the voluntary nature of the event absolves the
20          district of liability."  Again, appellant does not
            dispute that Camp KEEP was voluntary in nature, and
21          KCSOS offered evidence both regarding the voluntary
            nature of Camp KEEP and that students who did not go
22          remained at the school.  Accordingly, whether the
            activity took place on property also owned by KCSOS
23          does not change the nature of the activity nor the
            applicability of the immunity. This is especially true
24          where, as here, the students have left their regular
            school grounds and just happen to be having their
25          field trip on what may or may not be other KCSOS
            property.
26
27   *Id*. at *3 (citations omitted).
28

constituted a field trip or an excursion, not a school-sponsored activity. There are no allegations to indicate that [Plaintiff] was required to attend, or received credit for, taking part in the tournament [...] *[t]he tournament occurred when school was not even in session*.)(emphasis added); *see also Swearinger v. Fall River Joint Unified Sch. Dist.*, 212 Cal.Rptr. 400, 406 (1985), *review granted and opinion superseded by,* 701 P.2d 1172 (Jul. 18, 1985) ("One might argue that the basketball tournament [] doesn't fit neatly in either category [§35330 or §44808].   However, an examination of the statutory history of the usage of field trip or excursion reveals that that composite term *encompasses all off-campus school activities*.")(emphasis added).

        In this case, it is undisputed that the football camp was not a school-sponsored activity for which attendance was required and attendance credit given.  Defendants provided substantial evidence that the trip was voluntary, the event was held off campus on the grounds of another school, that it related to athletic endeavors of the high school, and comported with legislative intent.  Although the football camp's transportation was coordinated by the District, this fact "bear[s] no relation to whether the road trip was a school sponsored activity" and does not preclude the application of § 35330.  *See Myricks,* 74 Cal. App. 4th 231 ("The out of state tournaments were not part of LHS' formal CIF or summer intersession programs.   The fact that LHS authorized two of the plaintiffs to attend the tournaments without being dropped from the summer intersession program and bring school assignments with them does not suggest the road trip was a mandatory or required school activity.    Similarly,  Barfield's  use  of  LHS  facilities  and

68

equipment for [team] practices and the district's funding of its employees' emergency post-accident trip [] bear no relation to whether the road trip was a school sponsored activity for which attendance was required."). Gustine High School's July 2006 football camp at Liberty High School was a voluntary activity that qualified as a "field trip" within the meaning of the statutory framework. Granting summary judgment in favor of the District is also consistent with California case law, including *Myricks*, *Barnhart*, and *Cornn*, as well as *Casterson*, the most recent published decision discussing § 35330.

In his opposition, Plaintiff introduces several additional facts into the § 35330 analysis. Specifically, Plaintiff argues that genuine issues of material fact exist as to whether football camp is a field trip or excursion because:  (1) students attending the camp did not receive attendance credit from the State School Fund; (2) GUSD did not provide or make available medical or hospital service for students attending the football camp; (3) GUSD did not comply with its own internal guidelines for overnight field trips; and (4) GUSD did not procure permission slips.[31]  (Doc. 107, 11:8-15:2.)

---

[31] Plaintiff cites *Barnhart* for the proposition that the football camp is a field trip or excursion because the students attending the camp did not receive attendance credit from the State School Fund. Plaintiff's citation is unpersuasive; he incorporates § 35330(c)(1), a stand alone portion of § 35330. Section 35330(c)(1) provides: "The attendance or participation of a pupil in a field trip or excursion authorized by this section shall be considered attendance for the purpose of crediting attendance for apportionments from the State School Fund in the fiscal year. Credited attendance resulting from a field trip or excursion shall be limited to the amount of attendance that would have accrued had the pupils not been engaged in the field trip or excursion."

1    Plaintiff's   opposition   provides   substantial   factual
2  development  concerning  medical  care,  internal  guidelines,  and
3  permission  slips.    Plaintiff,  however,  does  not  support  his
4  argument  with  any  legal  authority.    There  is  nothing  in  Plaintiff's
5  26-page  opposition  or  the  accompanying  exhibits  and  declarations  to
6  support  the  proposition  that  these  criteria  are  relevant  to  a  §
7  35330  determination.    The  field  trip  immunity  is  clearly  defined  by
8  § 35330  and  the  universe  of  cases  interpreting  and  applying  § 35330
9  is  not  insubstantial.    Without  a  single  legal  citation  in  support,
10 it  is  impermissible  to  depart  from  the  statutory  language  and  the
11 substantial  California  case  law  interpreting  the  provision.[32]

12   Plaintiff  has  failed  to  create  a  triable  of  fact  whether  the
13 July  2006  football  camp  was  a  field  trip  or  excursion  within  the
14 meaning  of  § 35330.    Defendants'  motion  for  summary  adjudication  on
15 the  issue  of  § 35330  immunity  is  GRANTED  as  to  Plaintiff's  state
16 law  claims  only.

17

18   A.  Penal Code § 245.6

19   Plaintiff  argues  in  his  opposition  that  "notwithstanding  the
20 immunity  of  the  Education  Code,  Penal  Code  § 245.6[(e)]  provides  an

21

22

23
   [32] Plaintiff  argues  that  "if  the  camp  is  found  to  be  an  off-
24 premises  activity,  then  Education  Code  § 44808  applies."    (Doc.
   107,  17:1-17:3.)    However,  a  "school-sponsored  activity,"  within
25 the  meaning  of  § 44808,  is  one  that  students  are  required  to  attend
   and  for  which  they  receive  credit.  *Myrick*,  74  Cal.  App.  4th  at
26 239-240.    Here,  the  football  camp  was  not  a  "school-sponsored
   activity"  under  this  definition  because  attendance  was  optional.
27 The  immunity  from  liability  that  is  granted  under  § 44808  does  not
28 apply  here.

1   independent cause of action for acts of hazing."[33]  However, during

2   oral argument, Plaintiff's counsel conceded that a Penal Code §

3   245.6(e) claim was not specifically pled in the Complaint:

4          Court:       Then we have Penal Code Section 245.6, which
                        prohibits hazing and it's defined as the
5                       initiation or pre-initiation into a student
                        organization or student body  .  It does not
6                       include sanctioned events.  Doesn't that end
                        it?  You can't have it both ways, can you?
7
           Counsel:     I don't think it does.  But I think that the
8                       threshold issue is whether it was a field trip
                        or excursion because ---
9
           Court:       Yes.
10
           Counsel:     -- if it was not, then we don't even need to
11                      go to the hazing statute [...] Penal Code
                        245.6 is not a cause of action that was
12                      specifically pled in the complaint.  It's --

13         Court:       Then it's not a claim.

14         Counsel:     It's just a statute that provides an
                        independent cause of action for hazing
15                      activities.

16         Court:       But it's not alleged in the complaint, so
                        let's not go there.
17
           Counsel:     It's not in the complaint.
18

19   (RT 34:6-35:6.)

20       A party cannot maintain a cause of action that is not

21   specifically pled in the complaint.  *See, e.g., Seven Worlds LLC v.*

22   _____

23        [33] Penal Code § 245.6(e) provides, in relevant part:

24            (e) The person against whom the hazing is directed may
           commence a civil action for injury or damages. The
25         action may be brought against any participants in the
           hazing, or any organization to which the student is
26         seeking membership whose agents, directors, trustees,
           managers, or officers authorized, requested,
27         commanded, participated in, or ratified the hazing.

28

                                  **71**

1   *Network Solutions*, 260 F.3d 1089, 1098 (9th Cir. 2001); *accord Fox*
2   *v. Bd. of Trs. of the State Univ. of N.Y.*, 42 F.3d 135, 141-42 (2nd
3   Cir. 1994) (rejecting nominal damages claim not mentioned in the
4   complaint).   To conclude otherwise would render the pleading
5   requirements of Federal Rules of Civil Procedure illusory.   *See*
6   Fed.R.Civ.P. 8(a)(1)-(3) ("A pleading that states a claim for
7   relief must contain [...] a short and plain statement of the claim
8   showing that the pleader is entitled to relief.")   Here, it is
9   undisputed that the Complaint does not include a cause of action
10  under Penal Code § 245.6.   Plaintiff cannot, as presently
11  constituted, advance a hazing cause of action against any of the
12  named Defendants.   Defendants' motion for summary adjudication as
13  to Plaintiff's Penal Code § 245.6 is GRANTED.

15                      VI. CONCLUSION.
16       For the reasons set forth above:

18       A.   Applicability of "Field Trip" Immunity to Federal Claims
19            1.   California Education Code § 35330(d), California's
20  "field trip immunity," cannot immunize Defendants from liability
21  resulting from a violation of superceding federal law.

23       B.   Section 1983
24            1.   Summary adjudication is GRANTED in favor of
25  Defendant Gustine Unified School District against Plaintiff as to
26  Plaintiff's § 1983 claim.

27            2.   Summary adjudication is GRANTED in favor of
28  Defendants Scudder, Cano, Spaulding, and Souza in their official

                              72

capacities on Plaintiff's § 1983 claim.

3. Summary adjudication is GRANTED in favor of Defendants Scudder, Cano, Spaulding, and Souza in their individual capacities on Plaintiff's § 1983 claim.

C. <u>Title IX</u>

1. Summary judgment is GRANTED in favor of Defendants Jason Spaulding, Anthony Souza, Adam Cano, and Carl Scudder as to Plaintiff's Title IX claim for sexual discrimination and harassment.

2. Defendant GUSD has not provided sufficient evidence to either negate an essential element of Plaintiff's Title XI claim or show that Plaintiff does not have sufficient evidence to carry his ultimate burden of persuasion at trial. Defendant GUSD's motion for summary adjudication on Plaintiff's Title IX claim is DENIED.

D. <u>State Law Causes of Action</u>

1. Summary adjudication is GRANTED in favor of Defendants against Plaintiff as to Plaintiff's seventh and ninth causes of action for gender violence.

2. Summary adjudication is GRANTED in favor of Defendant GUSD as to Plaintiff's remaining state law claims. As Gustine Unified School District is an arm of the state, it is protected by the Eleventh Amendment and is immune from Plaintiff's state law claims in this Court.

3. Summary adjudication is GRANTED in favor of Defendants Jason Spaulding, Anthony Souza, Adam Cano, and Carl

Scudder as to Plaintiff's remaining state law claims.   Defendants Jason Spaulding, Anthony Souza, Adam Cano, and Carl Scudder are entitled to immunity on Plaintiff's state law claims pursuant to California Education Code § 35330(d), California's "field trip immunity."

        4.   Summary adjudication is GRANTED in favor of Defendants as to Plaintiff's claim under Penal Code § 245.6.

     Plaintiff shall submit a form of order consistent with this memorandum decision within five (5) days of electronic service.

IT IS SO ORDERED.

Dated:    December 22, 2009            /s/ Oliver W. Wanger
                                    UNITED STATES DISTRICT JUDGE

74